**Richard S. KEOSEIAN, Plaintiff,**

**v.**

**Hedda Schoonderbeek VON KAULBACH, Mayen Beckmann Wuerdig, Peter Beckmann, and "Anne Doe" and "Richard Doe" as Executors of the Estate of Mathilde Beckmann, Defendants.**

No. 88 Civ. 1544 (MBM).

United States District Court, S.D. New York.

May 15, 1991.

Adolph D. Seltzer, New York City, for plaintiff.

James D. Zirin, Breed, Abbott & Morgan, New York City, for defendant Hedda Schoonderbeek von Kaulbach.

OPINION AND ORDER

MUKASEY, District Judge.

Plaintiff in this action, Richard S. Keoseian, and defendant Hedda Schoonderbeek von Kaulbach, both claim to own a painting by the late German Expressionist Max Beckmann portraying his wife, Mathilde Beckmann, who was known as Quappi. The painting, "Portrait of Quappi," was devised by Quappi Beckmann to von Kaulbach, her sister, who is now in her nineties and lives in Germany. Keoseian asserts that von Kaulbach agreed in 1987 to give him the painting and that she confirmed that agreement in a written assignment; von Kaulbach argues that the purported assignment was incomplete under control-

ling law and was procured by fraud and overreaching. Now before the court are motions by von Kaulbach for summary judgment and by Keoseian to dismiss von Kaulbach's ninth affirmative defense, based on the invalidity of the assignment under German law. Apparently because of von Kaulbach's advanced age and frailty, she has not submitted an affidavit in support of her position, but relies instead on Keoseian's own testimony and his conduct contemporaneous with the events at issue. As explained below, it is clear based on controlling German law applied to Keoseian's own testimony and contemporaneous conduct that the assignment was incomplete. Therefore, von Kaulbach's motion is granted and Keoseian's is denied.

## I.

Keoseian's complaint seeks a declaratory judgment that von Kaulbach's assignment of the portrait is valid and enforceable. Defendants, in addition to von Kaulbach, are Frederic C. Houston and Perry Rathbone, the executors of Quappi Beckmann's estate, now in probate in the Surrogate's Court of New York County, and two potential claimants to the painting: Dr. Peter Beckmann, the son of the late artist by a marriage prior to the one with Quappi and now himself deceased, and Dr. Beckmann's daughter, Mayen Wuerdig. The facts, so far as they are relevant to this motion, are as follows: Quappi died in 1986. Under a 1975 will, Quappi had left the bulk of her estate to her sister, von Kaulbach, who was her only surviving relative. However, in 1982, apparently under the malign influence of two sisters who moved in with her, Quappi rewrote her will and left the bulk of her property to them, with von Kaulbach to receive only $5,000. Although the legal form of the legacy was modified, the 1982 will remained substantially in effect when Quappi died in 1986.

Plaintiff Richard Keoseian was a neighbor of Quappi's in New York after Max Beckmann died. He had met von Kaulbach in earlier years when von Kaulbach, who lives in Germany, was well enough to visit her sister in New York. When Quappi died von Kaulbach wished to contest the 1982 will, but she lived in Germany on a small pension and knew no lawyers in the United States other than Houston, who had served as Quappi's lawyer from 1950 to 1986. Houston, then recently retired, was unwilling to ask his firm to become involved. Von Kaulbach therefore authorized Keoseian, who called to offer assistance, to find her a lawyer who would act on a contingent fee basis and advance disbursements. Keoseian and the two executors named in the 1975 will, Houston and Rathbone, approached Edward J. Ross of Breed, Abbott & Morgan, to represent von Kaulbach. Keoseian and Houston negotiated and, with Rathbone, signed a retainer agreement with Ross, which Keoseian and Houston brought to Germany for von Kaulbach's signature. At the same time, von Kaulbach signed a "Foundation Trust" agreement brought over from New York by Keoseian and Houston, under which von Kaulbach promised to establish a trust with 75% of the net proceeds of her legacies from Quappi, creating the Max Beckmann Foundation, with Keoseian, Houston and Rathbone as the Foundation's directors and with Keoseian as its Executive Director. It is clear that Keoseian performed these services with no expectation of compensation other than the compensation he would receive as the Director of the Max Beckmann Foundation. The Foundation Trust agreement is the subject of separate but related litigation before me. *Hedda Schoonderbeek von Kaulbach v. Richard Keoseian*, 89 Civ. 4456 (MBM).

Ross commenced litigation and, eventually, the sisters settled, with the result that the 1982 will was invalidated and the 1975 will was admitted to probate in New York, with Houston and Rathbone as executors. According to Keoseian, out of gratitude for his efforts on her behalf, von Kaulbach promised to give him a painting of herself, painted by her father, who was also an artist, and the "Portrait of Quappi" by Beckmann. This promise allegedly was made first in June 1987, in a telephone conversation between Keoseian and von Kaulbach, and later renewed in a telephone conversation in which Houston also partici-

pated. Although von Kaulbach had possession of the painting by her father, she had only the right to receive the Beckmann painting under Quappi's will; the painting itself was part of Quappi's estate. According to Keoseian, von Kaulbach asked Houston to prepare any documents necessary to effect the gift.

Houston prepared a document in English entitled "Transfer of a Specific Legacy" ("the assignment contract") and instructed Keoseian to have it translated into German. Keoseian went to Germany and presented both the document and the German translation to von Kaulbach, who, outside his presence, signed the German version. The document states that Keoseian's services to von Kaulbach and Quappi were rendered "in the name of friendship" and that von Kaulbach was giving, conveying and transferring to Keoseian the "Portrait of Quappi." According to Keoseian, von Kaulbach intended and arranged to have the German version notarized, but first met with Dr. Peter Beckmann, who, according to Keoseian, caused her to change her mind about the notarization and apparently also about the gift itself. Keoseian returned to New York with the less valuable painting of von Kaulbach by her father, and the signed but not notarized German version of the contract assigning the Portrait of Quappi by Max Beckmann.

Keoseian believed that even though von Kaulbach signed it, the assignment contract would not bind her and transfer the painting until it was notarized and the notarization was confirmed by a court in Germany. Upon his return, he wrote von Kaulbach a letter dated August 28, 1987 in which he attempted to persuade her to change her mind and have the agreement notarized. He stated in the letter that "[Peter Beckmann's] influence caused you to break your promise, not honor your commitment to me and betray my trust in you" and "the completion of your promise to me ... was to have become official by a local Bürgermeister witnessing your signature with his stamps and seals and then the German Lower court in Garmisch–Pa., authorizing with his stamps and seals the Bürgermeister's signature.... Even

though you promised this 'Gift' and signed the German translation of the Assignment Letter which the United States Courts would recognize as an official document, it was not an official document until the proper German authorities put their stamps and seals on it." (Zirin Aff., Exh. 4, pp. 5, 10–11) The letter suggests that von Kaulbach decided not to have the agreement notarized because Dr. Beckmann told her both that she or the estate had substantial financial obligations still to be paid, and that an appraiser had valued the "Portrait of Quappi" as one of Quappi's most valuable assets.

The parties dispute whether von Kaulbach also reasonably believed that the assignment would not become effective until it was notarized, based on statements made to her by Keoseian.

## II.

The first issue on this summary judgment motion is whether German law or New York law applies. Von Kaulbach's Ninth Affirmative Defense is that the document is void under German law. Keoseian cross-moves for summary judgment striking this defense, arguing that New York law applies. Because New York is the forum state, New York's choice of law rules govern. *Bader v. Purdom*, 841 F.2d 38, 39 (2d Cir.1988). The traditional choice of law rule for assessing the validity of a contract would apply the law of the jurisdiction where the contract is made. *Recovery Consultants, Inc. v. Shih–Hsieh*, 141 A.D.2d 272, 534 N.Y.S.2d 374, 375 (1st Dep't 1988); *Intercontinental Planning, Ltd. v. Daystrom, Inc.*, 24 N.Y.2d 372, 248 N.E.2d 576, 300 N.Y.S.2d 817 (1969); *Russell v. Societe Anonyme des Etablissements Aeroxon*, 268 N.Y. 173, 181, 197 N.E. 185 (1935). Under this rule, the law of Germany would clearly govern. Although drafted in New York, the assignment contract was signed in Germany and the parties intended that it would be fully performed there.

However, the traditional black letter approach to choice of law has been replaced

by interest analysis, which " 'gives to the place 'having the most interest in the problem' paramount control over the legal issues arising out of a particular factual context, thus allowing the forum to apply the policy of the jurisdiction 'most intimately concerned with the outcome of [the] particular litigation.' " *Intercontinental Planning, Ltd.*, 24 N.Y.2d at 382, 248 N.E.2d 576, 300 N.Y.S.2d 817 (quoting *Auten v. Auten*, 308 N.Y. 155, 161, 124 N.E.2d 99 (1954)). A similar analysis has been adopted for cases involving tort and breach of contract claims: " 'the law of the jurisdiction having the greatest interest in the litigation will be applied.' " *Schultz v. Boy Scouts of America, Inc.*, 65 N.Y.2d 189, 197, 480 N.E.2d 679, 491 N.Y.S.2d 90 (1985) (citation omitted); *J. Zeevi & Sons, Ltd. v. Grindlays Bank (Uganda), Ltd.*, 37 N.Y.2d 220, 333 N.E.2d 168, 371 N.Y.S.2d 892, 898 (citation omitted), *cert. denied*, 423 U.S. 866, 96 S.Ct. 126, 46 L.Ed.2d 95 (1975). Under the circumstances of this case, the interests of Germany, where the assignment contract was entered into and where von Kaulbach resides, appear, for the reasons set forth at pages 1258–59 below, to outweigh the interests of New York, where the estate which includes the painting is in probate and where plaintiff resides. Accordingly, I find that under either the traditional black letter approach or the newer interest analysis, a New York court would apply German rather than New York law in determining the validity of the contract signed by von Kaulbach.

It is clear from the assignment contract that if the assignment was completed, it assigned to Keoseian as a gift von Kaulbach's claim to a specific devise under her sister's will—the "Portrait of Quappi." The assignment contract, which Houston drafted for Keoseian, states that von Kaulbach did "hereby GIVE, TRANSFER AND ASSIGN to the said RICHARD S. KEOSE-IAN ... that certain legacy known and entitled as: Painting by Max Beckmann, Portrait of Quappi ... directed to given [*sic*] to me by Clause 17th of the will of my said sister." (Seltzer Aff., Exh. D) The "Portrait of Quappi" is at present part of the Estate of Mathilde Beckmann which is currently being probated in New York. The parties do not dispute that the "Portrait of Quappi" is specifically devised to von Kaulbach under Quappi's will.[1]

Under New York law, an assignment of a legacy is effective absent notarization or acknowledgment except where otherwise required by statute. The only requirements for a valid assignment in New York are that the property to be assigned be clearly identified, that there be a clear demonstration of the assignor's intent to assign a present right in the property, and that the assignor thereafter have no control over the property. *Miller v. Wells Fargo Bank International Corp.*, 540 F.2d 548, 557 (2d Cir.1976); *In re Moskowitz*, 14 B.R. 677 (S.D.N.Y.1981). For purposes of this motion, which is limited to the question of whether German law governs, and, if so, whether von Kaulbach is entitled to summary judgment, I will assume that under New York law, the contract signed by von Kaulbach satisfies the legal requirements for a valid assignment.

Both parties have submitted affidavits of German law experts. Von Kaulbach submitted the affidavit of Dr. Thomas Schuerrle of the Munich law firm of Noerr, Stiefenhofer & Lutz, a member of the Munich bar since 1985, practicing principally in the fields of international, European Economic Community and antitrust law. Keoseian submitted the affidavit of Dr. Ernest C. Stiefel, a member of the German bar since 1932, and now an adjunct professor at New York Law School, where he teaches comparative law. Because these submis-

---

1. Under New York law, which governs estates in probate in New York, title to a specific testamentary devise vests in the beneficiary immediately upon the death of the testator. *In re Estate of Burke*, 129 Misc.2d 145, 492 N.Y.S.2d 892 (1985); *In re Morawetz' Will*, 35 Misc.2d 762, 231 N.Y.S.2d 1000 (1962). The executor has only a limited right to use the specifically de-vised property for payment of debts of the estate. *In re Estate of Ayres*, 91 Misc.2d 400, 397 N.Y.S.2d 1017, 1018 (1977). Therefore, although von Kaulbach did not have possession of the Beckmann painting at the time she promised it to Keoseian, she did have qualified title and the right to assign her claim to it.

sions did not fully address the issues raised in this complex dispute, a third expert on German law was summoned by the court to answer four specific questions. The parties do not dispute the third expert's analysis of German law, although they do dispute his application of the law to the facts. However, the analysis of the facts in this opinion is my own, not the expert's.

According to the court-appointed German law expert for this case, Professor George A. Bermann of Columbia Law School, German law regards the assignment contract here as both an offer or promise of a gift and an offer of assignment. Although an assignment contract in general does not require notarization in order to be effective under German law, if the underlying obligation the assignor owes the assignee, which the assignment is to satisfy—here, a gratuitous promise of a gift—requires notarization—as it does under German law—then the assignment contract would also in effect require notarization, simply because under German law, if the underlying obligation is void, the assignor has the right to get back from the assignee whatever was assigned. Alternatively, the assignor has the right to refuse performance. (Bermann Opinion on German Law, pp. 10–11) Bürgerliches Gesetzbuch ("BGB") § 518, which governs the requirements for a promise of a gift under German law, provides as follows:

> § 518. [Form of promise of gift]
>
> (1) For the validity of a contract whereby an act of performance is promised gratuitously, notarial authentication of the promise is necessary....
>
> (2) Any defect of form is cured by the performance of the promise.

Thus, a promise of a gift must be notarized to be enforceable, absent performance of the promise.

The German concept of notarization is different from its New York equivalent. A German "Notar" is a highly trained legal professional authorized to render legal advice as well as to draft legal instruments. The Notar has the exclusive right to prepare the particular types of documents which under German law require notariza-

tion. According to Professor Bermann, the purpose of the notarization requirement is to ensure that, for particular types of contracts, the parties who enter into them fully understand their importance and attendant risks and consequences. "The requirement of recourse to a notary is intended to induce a measure of reflection ... on the seriousness of the transaction." (Bermann Opinion on German Law, pp. 13–14)

The German notarization requirement therefore reflects a policy which relates directly to the main issue in this case. German law seeks to prevent parties from entering into binding contracts, not supported by consideration, unless these parties understand and reflect upon the consequences to themselves. Under German law, a party who makes a gratuitous promise must consult a legal expert, a Notar, before his promise is enforceable, unless he has already performed the promise. There is no dispute in this case that von Kaulbach acted without the benefit of legal advice when she allegedly promised the paintings to Keoseian. Keoseian admits that at the time von Kaulbach decided to make a gift to him, she could not have considered the Sotheby valuation of "Portrait of Quappi" at $500,000, which had not yet been received. (Keoseian Dep. at 395–96) According to Keoseian, she was an elderly woman deeply grateful for services he performed, without expectation of compensation, for her and for her late sister. Over the phone, she promised him the paintings and told Houston, by his own admission not acting as her lawyer, to do whatever was necessary to see that Keoseian got them. Some months later, when Keoseian arrived in Germany with a written contract in hand, he was coldly received. (Keoseian Dep. at 364–68, 530–31) Allegedly because of the influence of Dr. Beckmann, von Kaulbach changed her mind. Keoseian's August 1987 letter to von Kaulbach, written after he discovered that she did not intend to have the written contract notarized, suggests that von Kaulbach's reasons for changing her mind reflect precisely the considerations that prompted the notarization requirement—namely, that she had been made aware of certain legal obli-

gations that had to be satisfied out of the estate, and hence the consequences of giving away an estate asset which Dr. Beckmann told her was very valuable. Keoseian's letter states, *inter alia:*

> In spite of both my very cold reception and send off and what appears to be your broken promise of the *two* Portraits, especially in the face of the very successful application of all of my skills, resources and energies, in your behalf over the past 20 months, without compensation, I have researched and studied what I understood was [Dr. Beckmann's] ... letter from your translation....
>
> First, I should point out that it is a matter of German Tax Law (unless there are recent changes) that for the amount on inheritance that you could receive ... your tax rate is not the 46% or $924,000 dollars which [Dr. Beckmann] claims, but 38% or $760,000 dollars. Under German Tax Law, for the same amount of inheritance, [Dr. Beckmann's] and Mayen's taxes would be 56% because German Tax Law recognizes and does not look as favorably on non-blood relations....
>
> Second, Peter does not tell you that there is effective the "German–United States Inheritance Tax Treaty" by which Germany will grant you a credit for all United States taxes which are charted against your share of the estate to avoid double taxation. Because the taxes against you here may be higher than the taxes against you in Germany, you will *not* have to pay *any* German tax, *so you can forget even the $760,000 dollar German Tax on your inheritance....*
>
> Third, [Dr. Beckmann] is also incorrect to assign to you personally the obligation of the Ed Ross fee of $1,200,000. It was the Ed Ross Agreement, ... in which he said he was satisfied with getting his fees from the Estate and not from you personally.... And so, *[Dr. Beckmann's] claim that you have $2,124,000 dollar obligation is totally false....*

(Zirin Aff., Exh. 4) (emphasis in original) Keoseian also responded to Dr. Beckmann's statements to von Kaulbach concerning the value of the Beckmann paint-

ing, and the worth of Keoseian's efforts on von Kaulbach's behalf. (Zirin Aff., Exh. 4)

The interest analysis approach to choice of law requires that, in the case of conflicting laws, the contacts the issue under dispute has with each forum must be analyzed in light of the policies and purposes to be served by the conflicting laws. *Intercontinental Planning, Ltd.,* 24 N.Y.2d at 382, 248 N.E.2d 576, 300 N.Y.S.2d 817. Regardless of whether von Kaulbach's concerns were justified or were raised solely through the influence of Dr. Beckmann, Germany has expressed an interest in protecting its citizens from the consequences of unexecuted promises made without careful consideration. Thus, Germany has a strong interest in applying its law to protect von Kaulbach, a citizen of Germany, who allegedly made a gratuitous promise in Germany, without the benefit of legal advice, and who now allegedly has reconsidered once the consequences of her gift became clear to her.

New York has no strong countervailing interest in protecting the rights of Keoseian, other than a general interest in having contracts enforced if legally valid. *See Kristinus v. H. Stern Com. E Ind. S.A.,* 463 F.Supp. 1263, 1265 (S.D.N.Y.1979) ("Usually, of course, this interest must bow to the paramount interest of the state or country where the contract is made in regulating the conduct of those within its territory"). Although the estate is in probate in New York, the primary interest of New York arising from that circumstance is to assure that the testatrix's wishes, to the extent recognized by New York courts, are carried out. That interest, however, is not engaged here because there is no dispute in this case about whether and how to carry out Quappi Beckmann's wishes. Rather, the dispute here concerns whether and how to give effect to von Kaulbach's and Keoseian's actions in Germany. Keoseian's New York citizenship adds nothing on New York's side to the balance of interests. There is no authority for the proposition that a state's laws follow and protect its citizens whenever they transact business elsewhere. *See Kristinus, supra* (Brazilian statute of frauds does not apply to

invalidate oral contract entered into in Brazil but only because the defendant transacts business in New York and the oral contract was to be performed there). To be sure, New York does have an interest in assuring regularity in the transfer of property within its borders and controlled by its courts. *Kunstsammlungen Zu Weimar v. Elicofon*, 536 F.Supp. 829, 846 (E.D.N.Y. 1981), *aff'd* 678 F.2d 1150 (2d Cir.1982). But that interest has not been invoked here. In this case, what is at issue is the transfer of a claim to property which happens to be located in New York, not transfer of the property itself. The transfer of von Kaulbach's claim to the Portrait of Quappi could have been wholly accomplished in Germany.

New York's criteria for giving effect to the transfer at issue here, informal when compared with those applicable in Germany, are potentially relevant only insofar as they may bear on what Keoseian, as a New Yorker, might have believed was the effect of his and von Kaulbach's actions. That relevance, however, is potential only and not actual because Keoseian's beliefs and expectations as to the consequences of his dealings with von Kaulbach are set forth indelibly in a letter he wrote himself, a letter that strongly supports von Kaulbach's position in this lawsuit. (Zirin Aff., Exh. 4) Because New York has no strong countervailing interest in applying its law, a New York court would apply German law to determine the validity of the assignment contract.

### III.

The writing signed by von Kaulbach was not notarized by a Notar pursuant to BGB § 518(1), but that does not end this inquiry. As previously stated, under BGB § 518(2): "Any defect of form is cured by the performance of the promise." In other words, if von Kaulbach's promise to Keoseian was fully performed, the writing is valid under German law even absent notarization.

Whether von Kaulbach's promise has been fully performed within the meaning of BGB § 518(2) is a fact matter to be determined in light of the reasonable expectations of the parties. Under the circumstances of this case, taking Keoseian's account of the facts as true, as I must on this motion for summary judgment, it is clear that the parties intended that the promise would be fully performed when the claim to the legacy was transferred, rather than when the painting itself was transferred to Keoseian. Von Kaulbach told Houston to do whatever was necessary to see that Keoseian got the painting. Houston drew up the assignment contract, which was translated into German and presented to von Kaulbach by Keoseian for her signature. If von Kaulbach had caused the document to be notarized in accordance with her agreement with Keoseian, both parties would have considered their transaction consummated. Keoseian need only have awaited the completion of probate; the painting would have been released direct to him without any further action by von Kaulbach.

That brings us to the question of when the parties intended that von Kaulbach's claim to the painting would be transferred to Keoseian. Under German law, a document that purports to assign a claim need not be notarized. Therefore, absent agreement otherwise, mere delivery of the assignment document, once signed, would constitute transfer of the claim, and hence full performance of the promise for purposes of BGB § 518(2). But Keoseian's own testimony shows irrefutably that the parties agreed otherwise—that he did not believe von Kaulbach's claim to the painting was validly assigned until the assignment contract was notarized. In his deposition, Keoseian testified:

Q: But [Houston] advised you that is was necessary to have an instrument of this kind notarized?

A: He advised me that this is what I should do. I don't know that he advised me that it was necessary to have it notarized. He advised me of the steps, so I understood this is what I should do.

Q: You understood it was necessary either to have her sign it in English before the America Consul in Munich, or to have

her sign it in German before the burgermeister and then take it to Garmisch and have a judge in Garmisch certify what the burgermeister had done?

A: That's right.

Q: On August 6th you presented Hedda with the assignment, then what did you say to her?

A: I told her what [Houston] had instructed me.... I ... told her what Fred told me should be done. She said, "Oh, no, no. We will go to the studio, and when we come back from the studio I will call the burgermeister and make an appointment for tomorrow morning, and we will have it stamped and notarized ..."

(Keoseian Dep. at 387–88).

Q: Was it you who proposed that the assignment be made official by the local burgermeister?

A: I was following the instruction of Fred, and I relayed the instructions to Hedda and that's what I proposed to her, yes.

\*       \*       \*       \*       \*       \*

Q: You go on [referring to the letter Keoseian wrote to von Kaulbach upon his return to New York], "Even though you promised this gift and signed the German translation of the assignment letter ... it was not an official document until the German authorities put their stamps and seals on it."

A: That was my understanding at the time.

(Keoseian Dep. at 564) He later testified:

Q: When you parted with Hedda on August 10th, did you part on good terms?

A: We parted on good terms, but—you know, I was very unhappy, she knew that, so we were both distant from each other at that point.

Q: You were unhappy about what?

A: At what transpired ...

Q: You were unhappy that she did not go with you to the burgermeister?

A: Surely. It was my understanding that the burgermeister—that that part of what was required to complete the gift. So I was unhappy with the fact that

Peter Beckmann seemed to have interloped ...

(Keoseian Dep. at 511–12) And finally: "At the time I did not believe that she had completed her promise. I did not have counsel and I thought the gift hadn't been completed." (Keoseian Dep. at 531–32) Whether or not German law required it, the parties could agree that notarization would be necessary before the assignment became effective, and if they did, they would be bound by that agreement. BGB § 158(1) states: "[i]f a legal transaction is entered into subject to a condition precedent, the legal transaction made dependent on the condition becomes effective upon the fulfillment of the condition."

For purposes of determining whether the parties intended that the assignment contract be notarized before it was effective, it is irrelevant that Keoseian misunderstood the legal requirements for effecting such a transfer. RGRK § 154, note 7, Münchener Kommentar (vol. 1) (2d ed. 1984), § 154, note II, 2a, (cc) (citing RGZ 69, 74, 76; OLG Düsseldorf, DB 1970, 1778). It is enough that he believed that von Kaulbach had not yet fully performed under their agreement. Based on the statements Keoseian made at the time the events in question occurred, as recorded in his August 1987 letter to von Kaulbach, it is inconceivable that he intended notarization of the assignment contract to be a mere formality, intended only to facilitate the filing and recording of the document in New York. When word and thought were original with him, and both were unclouded by this litigation, he wrote as follows:

Hedda, the completion of your promise to me of Quappi's Portrait painted by Max in 1925 was to have become official by a local Burgermeister witnessing your signature with his stamps and seals and then the German Lower Court in Garmisch–Pa., authorizing with his stamps and seals the Burgermeister's signature. This procedure was established as a result of the Hague Convention to simplify the recognition of official documents in the United states. Even though you promised this "Gift" and signed the German translation of the Assignment Let-

ter which the United states Courts would recognize as an official document, it was not an official document until the proper German authorities put their stamps and seals on it. Although Peter's interference was incorrect, not only because of his false assertions and "uncivilized" tactic to pressure you to break you agreement with me, the Assignment Letter was not official without the proper seals and stamps.

(Zirin Aff., Exh. 4, pp. 10–11)

The only remaining question is whether von Kaulbach shared Keoseian's understanding that notarization was required before the assignment was complete. In other words, did both parties so agree? Again, Keoseian himself testified he told von Kaulbach that notarization was necessary, and that she accepted that view and acted on it. Keoseian testified that he told von Kaulbach the assignment contract had to be notarized in order to make it official. (Keoseian Dep. at 383–84, 563) She responded that she would call the Bürgermeister to make an appointment to stamp and notarize the document on the following day, Friday. (Keoseian Dep. at 388) His August 1987 letter, quoted above, confirms that Keoseian understood, hence von Kaulbach was told, that notarization was more than a mere formality.

The only fact that suggests even mildly that von Kaulbach may not have thought notarization was necessary to effect the transfer is her statement, reported by Keoseian, as she handed him the signed assignment contract: "Here's Hilde's Portrait." This suggests, albeit mildly, that she may have considered notarization merely a formality. But the statement itself is highly ambiguous, and must be considered in the context of her contemporaneous actions and Keoseian's. Keoseian testified that she said she would call the Bürgermeister, tell him the signature was hers, and that she expected he would stamp and notarize it. (Keoseian Dep. at 390–91) The Bürgermeister was the husband of Dr. Beckmann's secretary.

The next day the Bürgermeister called to say that because the office was closed, he would not be able to seal and stamp the document until Monday. (Keoseian Dep. at 474) On Sunday, Dr. Beckmann joined von Kaulbach, Keoseian and a friend of von Kaulbach's for lunch, and in German pleaded with von Kaulbach not to give the "Portrait of Quappi" to Keoseian because it was one of only two museum pieces in the estate, which meant that it was easy to sell, and there were many expenses to be paid. (Keoseian Dep. at 482–83) That evening, von Kaulbach asked Keoseian whether he would take any other Beckmann, and he said that he was not interested in any other Beckmann. (Keoseian Dep. at 487) This statement, also reported by Keoseian, reflects that von Kaulbach believed she had not yet transferred the portrait, or there would be no point in asking whether Keoseian would take a different painting instead. On Monday morning Dr. Beckmann drove Keoseian to the train station. Keoseian has testified that he explained to von Kaulbach before she signed the assignment contract his understanding of what steps were necessary to complete the gift. He has also testified, and the documentary evidence makes it clear, that at that time he understood that notarization of the assignment contract was essential to complete the assignment. I cannot reasonably infer based on these undisputed facts that von Kaulbach believed her signature on the assignment contract was sufficient to complete the assignment absent notarization.

Based on the above facts, it is beyond dispute that both parties understood and agreed that notarization of the assignment contract, for whatever reason, was required. Under German law, once it is established that the parties agreed to require notarization, Keoseian bears the burden to show that von Kaulbach intended that the assignment contract would be valid even absent notarization. (Bermann Opinion on German Law, at p. 21) BGB § 154(2) states:

§ 154(2). [Lack of authentication] If it has been planned that the contract contemplated be authenticated, in case of doubt the contract is not concluded until the authentication has taken place.

Keoseian has not carried this burden. Accordingly, the promise was not performed, and under BGB § 518, the gift fails.

\* \* \* \* \* \*

For the above reasons, defendant's motion for summary judgment is granted. Plaintiff's motion to strike defendant's Ninth Affirmative Defense is denied.

SO ORDERED.