**Hedda Schoonderbeek von KAULBACH, Plaintiff,**

v.

**Richard S. KEOSEIAN, Frederic P. Houston, Perry T. Rathbone, and Robert Abrams as Attorney General of the State of New York, Defendants.**

89 Civ. 4456 (MBM).

United States District Court,
S.D. New York.

Jan. 30, 1992.

James D. Zirin, Breed, Abbott & Morgan, New York City, for plaintiff.

Adolph D. Seltzer, New York City, for defendant Richard S. Keoseian.

Seth Rubenstein, Brooklyn, N.Y., for defendants Frederic P. Houston and Perry T. Rathbone.

Susan Scheid, Asst. Atty. Gen., New York City, for defendants.

## OPINION AND ORDER

MUKASEY, District Judge.

This is a motion for summary judgment by plaintiff Hedda Schoonderbeek von Kaulbach, who seeks a declaration that the agreement she signed to establish a trust is unenforceable. Her summary judgment motion in a companion case, *Keoseian v. Schoonderbeek, et al.*, 88 Civ. 1544 (MBM), was granted in an opinion reported as *Keoseian v. Von Kaulbach*, 763 F.Supp. 1253 (S.D.N.Y.1991), *aff'd mem.*, 956 F.2d 1160 (2d Cir.1992). Familiarity with that opinion is assumed for current purposes. Von Kaulbach argues that the Foundation Trust agreement is not enforceable because it lacks notarial validation required by German law, or in the alternative because it constitutes a promise to make a gift in the

future, and therefore is unenforceable under New York law. She argues also that if it was once enforceable, it has been validly revoked.

For the reasons set forth below, the motion for summary judgment is granted.

### I.

The Foundation Trust agreement requires von Kaulbach to donate 75% of her net legacy under her sister Quappi Beckmann's will to the Max Beckmann Foundation, an entity not yet formed. The idea to create the Foundation apparently originated with defendant Richard Keoseian and was approved by defendant Perry Rathbone; defendant Frederic P. Houston drafted the agreement in the summer of 1986, when von Kaulbach initially decided to contest Quappi's 1982 will. That will left most of Quappi's estate to her companions rather than to her sister von Kaulbach, as her 1975 will had. *Von Kaulbach*, 763 F.Supp. at 1254.

According to defendants Houston and Keoseian, von Kaulbach on several occasions stated that she neither liked nor wanted the Max Beckmann paintings that comprised the bulk of her sister's estate. Not only did this create litigation strategy problems for von Kaulbach by making it appear more probable that Quappi decided voluntarily to leave her estate to her companions rather than to her sister, but according to Houston it also cast doubt on whether von Kaulbach would be willing to press the will litigation to conclusion. Houston believed that creating a Max Beckmann Foundation would solve the problem by bringing into existence an entity that would receive either the paintings or the proceeds from their sale, and therefore would have an interest in pursuing the litigation. He believed that if von Kaulbach irrevocably conveyed to the Foundation her interest in the estate, then the trustees would have standing to pursue the litigation in her stead if her enthusiasm waned. Keoseian, Houston and Rathbone were nominated as the trustees of the proposed Foundation, with Keoseian designated also its Executive Director. Houston

and Keoseian aver that von Kaulbach's execution of the Foundation Trust agreement was an important basis for their decision to undertake the will contest. The document did not call for the establishment of the foundation unless and until von Kaulbach prevailed in that contest.

Keoseian and Houston presented the document, entitled "The Foundation Trust," to von Kaulbach in Germany, along with Breed, Abbott & Morgan's retainer agreement. Houston avers that he reviewed the Foundation Trust agreement paragraph by paragraph with von Kaulbach, and then line by line explained its most important terms. (Houston Dep. at 36–37) The Foundation Trust agreement provided in relevant part as follows:

> Hedda further agrees specifically ... (c) to notify the Executors at an appropriate time, or as requested by the Trustees, that the Executors shall divide the net proceeds of the legacies payable or deliverable to Hedda [75% to the Foundation and 25% to her]....

(Seltzer Aff.Exh. C) Houston also discussed with her the Breed, Abbott retainer agreement. (*Id.* at 37) These discussions took place at four meetings with von Kaulbach, each lasting 1½ to 2 hours.

Von Kaulbach then signed both agreements in the presence of Houston, Keoseian and the United States Consul in Munich. The Consul certified that von Kaulbach, Keoseian and Houston personally appeared before him and executed the Foundation Trust agreement after he informed them of its contents and they acknowledged to him that they executed it freely and voluntarily "for the uses and purposes therein mentioned." (Zirin Aff.Exh. 3)

In November 1987, von Kaulbach signed a document entitled "Revocation of Document Entitled 'The Foundation Trust,'" which states in relevant part:

> It has been brought to my attention recently that there exists a document entitled "The Foundation Trust", dated July 29, 1986, which appears to bear my signature.... Although I recall signing some papers in July of 1986 which I thought concerned the retention of Ed-

ward J. Ross, Esq. [of Breed, Abbott & Morgan], to represent me in the legal proceedings concerning the Estate of my sister, ... I do not recall ever having signed the document entitled "The Foundation Trust," and that document did not then and does not now represent or state my intentions or desires. Accordingly, I hereby revoke the document entitled "The Foundation Trust" and declare it null and void.

(Zirin Aff.Exh. 4) The document was sent to Keoseian, who told Houston and Rathbone of its contents.

Keoseian, through his lawyer, rejected the revocation in a letter which states in part: "Should the executors not voluntarily turn over to the Foundation Trust 75% of [von Kaulbach's] legacy, then ... a plenary suit will be instituted on behalf of the Foundation Trust ... to compel the Executors to turn over 75% of [her] legacy to it." (Seltzer Aff.Exh. A) In response, von Kaulbach brought this action to void the Foundation Trust agreement.

## II.

■ Defendant Keoseian raises as an affirmative defense a previously filed suit in Surrogate's Court, New York County, in which the validity of the Foundation Trust agreement is an issue. He invokes the familiar rule that when there are two competing lawsuits, "the first suit should have priority, 'absent the showing of balance of convenience in favor of the second action,' or unless there are special circumstances which justify giving priority to the second." *William Gluckin & Co. v. International Playtex Corp.*, 407 F.2d 177, 178 (2d Cir. 1969) (quoting *Remington Products Corp. v. American Aerovap, Inc.*, 192 F.2d 872, 873 (2d Cir.1951)).

The suit in Surrogate's Court is an accounting proceeding brought by the temporary administrators of the Estate of Mathilde Beckmann. As evidence that the issue has been raised in the accounting proceeding, Keoseian cites Schedule J of the accounting, where the temporary administrators, one of whom is von Kaulbach's lawyer in this case, state that there is a document

which purports to create a "Foundation Trust," but that von Kaulbach has disavowed any intention to transfer assets to any such foundation, and that "[t]he temporary administrators believe issues relating to the validity of this document are not part of this proceeding." (Zirin Aff.Exh. 5) Plaintiff contends that the schedule is purely informational, and does not show that the parties to the accounting have joined issue before the Surrogate as to the validity of the Foundation Trust agreement.

■ Even if this issue has been raised before the Surrogate, I need not dismiss this case. Special circumstances justify continuing this action, whatever the issues in the accounting proceeding before the Surrogate. First, this case is closely related to *Keoseian v. Schoonderbeek, supra,* which was heard and decided here without objection. Second, von Kaulbach is not a party to the accounting proceeding before the Surrogate; she has filed no objection or other pleading in that forum.

Further, the parties and the court have spent substantial time and resources in the litigation of the two lawsuits, including extensive briefing as well as retention of a court-appointed expert in German law. There is no sense in dismissing this case at its advanced stage in favor of an accounting proceeding where the issue peripheral if it is present at all.

The affirmative defense is insufficient and is dismissed.

## III.

Von Kaulbach argues that German law governs the validity of the Foundation Trust agreement, and that the agreement therefore is unenforceable because it was not notarized in accordance with Bürgerliches Gesetzbuch ("BGB") § 518, which specifies the requirements for a promise of a gift.

■ Because New York is the forum state, I am bound by New York choice of law principles. *Bader v. Purdom*, 841 F.2d 38, 39 (2d Cir.1988). Those rules provide that " 'the law of the jurisdiction having the greatest interest in the litigation will be

applied.'" *Schultz v. Boy Scouts of America, Inc.*, 65 N.Y.2d 189, 197, 491 N.Y.S.2d 90, 480 N.E.2d 679 (1985) (citation omitted); *J. Zeevi & Sons, Ltd. v. Grindlays Bank (Uganda), Ltd.*, 37 N.Y.2d 220, 371 N.Y.S.2d 892, 333 N.E.2d 168 (citation omitted), *cert. denied*, 423 U.S. 866, 96 S.Ct. 126, 46 L.Ed.2d 95 (1975). The Foundation Trust agreement contains no choice of law provision, nor is there any evidence that the parties ever discussed which law would govern the agreement. In any event, although they must be considered, choice of law provisions do not control. *Walter E. Heller & Co. v. Video Innovations, Inc.*, 730 F.2d 50, 52 (2d Cir.1984), and cases cited therein.

■ Generally, the jurisdiction where a contract was made has a substantial interest in determining the contract's validity: the interest of that jurisdiction in regulating conduct within its borders. *See Recovery Consultants, Inc. v. Shih–Hsieh*, 141 A.D.2d 272, 275, 534 N.Y.S.2d 374, 375 (1st Dep't 1988) and authority cited therein. The Foundation Trust agreement was drafted in New York, but was signed and acknowledged in Germany, where von Kaulbach is a citizen and resident.

■ New York's interest in the litigation does not outweigh Germany's substantial interest arising from execution of the agreement within its borders. Although it is not clear from the Foundation Trust agreement where the proposed foundation was meant to be established, the Breed, Abbott retainer agreement, signed by von Kaulbach the same day, recites that von Kaulbach intended to establish the foundation in New York. (Seltzer Aff.Exh. H) To be sure, New York has a strong interest in enforcing charitable gifts to New York foundations, but at the time the Foundation Trust agreement was executed the Max Beckmann Foundation was only an anticipated and not an actual entity; the agreement was to take effect only if von Kaulbach prevailed in the will contest then about to begin in Florida. At that time, the only significant contact between these facts and New York was that most of the assets comprising Quappi Beckmann's estate were located in New York.

The other contacts between New York and the underlying facts are insignificant. Two of the nominated trustees, Keoseian and Houston, are New York residents; Rathbone, until his retirement, was employed in New York. The will litigation, discussed in the agreement, was to be pursued in the courts of Florida, although much of the underlying work presumably was done in New York. Now that von Kaulbach has prevailed in that litigation, Quappi Beckmann's estate is being probated in New York. The Attorney General of the State of New York has disclaimed any position with respect to this motion; he certainly does not seek to exercise any supervisory authority vouchsafed to him under N.Y. EPTL § 8–1.4. (Letter of Susan Scheid, Esq., Assistant Attorney General, to the Court, Oct. 7, 1991).

In these circumstances, the usual rule should apply and the law of the place of execution, Germany, should govern. *See Recovery Consultants, supra.*

■ Under BGB § 518, a gratuitous promise to make a gift is unenforceable unless it is either fully performed or notarized by a Notar. There is no question that this promise was executory and that it was not notarized by a Notar. In the Foundation Trust agreement, von Kaulbach promised "to notify the Executors at an appropriate time, or as requested by the Trustees, that the Executors shall divide the net proceeds of the legacies payable or deliverable to Hedda" in the proportion called for in that agreement, 75% to the Foundation and 25% to her. This was a promise to do an act in the future that would have the effect of conferring a gift. It was not a statement that a gift had been conferred in the agreement itself, nor could it have been, because: (i) plaintiff's recovery in the will contest was wholly speculative at the time she signed the agreement; (ii) the foundation was not yet in existence, and still is not, and therefore could not have received the gift if one had been conferred; and (iii) there are no words of present

transfer in the Foundation Trust agreement.

The German concept of notarization is different from its New York equivalent. A German "Notar" is a highly trained legal professional authorized to render legal advice as well as to draft legal instruments. According to Professor George A. Bermann of Columbia Law School, the German law expert called by the Court,

> the purpose of the notarization requirement is to ensure that, for particular types of contracts, the parties who enter into them fully understand their importance and attendant risks and consequences. "The requirement of recourse to a notary is intended to induce a measure of reflection ... on the seriousness of the transaction.to

*Von Kaulbach,* 763 F.Supp. at 1257.

Defendant contends that this interest has been satisfied, and therefore the failure to notarize the agreement should not bar its enforcement. The Foundation Trust agreement was executed before the United States Consul in Munich, whose responsibility, as set forth in his certificate of acknowledgment, was to attest to the voluntariness of execution as well as to the parties' understanding of what they were signing. (Zirin Aff.Exh. 3) However, there is one significant difference between the way the document was executed and the way BGB § 518 requires that it be executed: von Kaulbach did not receive legal advice as to the risks and consequences of the transaction. Thus, even if I were free to hold that BGB § 518 may be satisfied by execution before this country's Consul in Munich, the evidence would have to show that he is in all relevant respects as qualified as a German Notar. There is no evidence that he is. Rather, he must rely on the averment of perhaps inexperienced and unadvised parties that they understand all the ramifications of what they are doing. To hold that notarization before the United States Consul in Munich fulfills the requirements of BGB § 518 would violate the policies underlying that law, as explained by Professor Bermann. Therefore, the Foundation Trust agreement must be found void for want of proper execution under German law.

## IV.

Even if New York law were applied, as Keoseian urges, the result would be the same. Defendants do not dispute that the transfer of 75% of von Kaulbach's legacy was an inter vivos gift. Under New York law, an inter vivos gift is enforceable only if the donee can show an intention by the donor to make a gift, delivery of the property which comprises the gift, and acceptance by the donee. *In re Estate of Szabo,* 10 N.Y.2d 94, 98, 217 N.Y.S.2d 593, 176 N.E.2d 395 (1961); *In re Van Alstyne,* 207 N.Y. 298, 306, 100 N.E. 802 (1913). The donee must establish clearly and unambiguously that the donor intended to make a present transfer of the property, and "[t]he delivery required must be such as to vest the donee with control and dominion over the property ... [although] this requirement must be tailored to suit the circumstances of the case." *Szabo,* 10 N.Y.2d at 98, 217 N.Y.S.2d 593, 176 N.E.2d 395.

Defendants contend that the Foundation Trust agreement constitutes a present transfer of von Kaulbach's claim to a legacy, and that under the circumstances—specifically, before the successful resolution of the litigation—von Kaulbach transferred all that she controlled, retaining no dominion over the property. According to defendants, until the estate is settled, title to Quappi's estate is vested in the executors, not in the beneficiaries. Therefore, argues Keoseian, the Foundation Trust agreement represents a delivery of von Kaulbach's interest in the estate to the fullest extent possible on the date of its execution. He reads the agreement itself to require the executors to hand over to the Foundation 75% of von Kaulbach's legacy as soon as the estate is settled.

The flaw in Keoseian's argument is that it finds no support in the Foundation Trust agreement. As set forth above, von Kaulbach does not purport to transfer anything under the Foundation Trust agreement, but promises only to direct the executors to

make the transfer at some future "appropriate time." There are no words of present transfer in the agreement. Indeed, the document does not contain even a direction to pay at a future time, which would itself be insufficient: "where the only gift is found in a direction to divide or pay at a future time, the gift is future, not immediate; contingent and not vested." *In re Crane*, 164 N.Y. 71, 80, 58 N.E. 47 (1900).

It would have been easy for von Kaulbach to have signed an agreement transferring to Quappi's executors von Kaulbach's right to a legacy, and directing them irrevocably to divide that legacy between her and the Foundation. She did not, and that failure signals an incomplete transfer. Two New York Court of Appeals cases point the way. One is *Szabo*, where decedent, owner of 122 shares of common stock, was informed in April 1959 that the stock had split. Before she received the certificates reflecting the split, she executed on the back of one of four certificates representing 50 of her 122 shares an assignment to appellant of an interest in the stock. She directed her niece to have the company put appellant's name on all stock certificates, presumably as joint tenant with right of survivorship, although she directed that the actual transfer of the stock await arrival of the new certificate. She died before the certificate arrived and before the transfer was entered on the company's books.

The issue on appeal was whether there was sufficient delivery under the circumstances of any or all of the stock so as to vest appellant with control and dominion over the inter vivos gift. The Court of Appeals found there was not adequate delivery:

> [W]here a transfer of a part interest in stock certificates is concerned, a symbolical delivery would be sufficient for it is the only kind of delivery that would be practicable under the circumstances.... Nevertheless, even this sort of delivery must proceed to a point of no return.... This indorsement was evidence of her intent but it was not sufficient to complete a symbolic delivery. The transfer agent was her agent for the purpose of

delivery and subject to her direction until the transfer was completed on the books of the company. She had the power to revoke the agency up until the time the transfer, or symbolical delivery, was actually made.

*Szabo*, 10 N.Y.2d at 98–99, 217 N.Y.S.2d 593, 176 N.E.2d 395.

As in *Szabo*, von Kaulbach had the power to effect a complete transfer of her interest in the estate at the time she signed the agreement. She certainly expressed an intent to effect such a transfer at some point, yet she reserved some power over her interest by promising to direct its transfer in the future. Therefore, defendants cannot establish clearly and unambiguously that complete dominion and control was vested in the trustees as of the time the agreement was executed, and thus can not enforce her promise as a valid inter vivos gift.

The second case is Judge Cardozo's opinion in *Farmers' Loan & Trust Co. v. Winthrop*, 238 N.Y. 477, 144 N.E. 686 (1924). There, the settlor of a trust was herself the beneficiary under a testamentary trust whose accounts were being settled at the time she established her own trust. The corpus of the trust she established was to be used for her benefit during her lifetime and, upon her death, was to be distributed to specified remaindermen. She delivered $5000 to her trustee, planning to augment that sum with the substantial proceeds she would receive when the testamentary trust was settled. She delivered also to her trustee two powers of attorney, one authorizing the trustee to receive the proceeds to which she was soon to be entitled, the other to sell any of those proceeds that came in the form of stock. Further, she delivered as well to her trustee a letter confirming delivery of the two powers of attorney and instructing as follows: "My desire is and I hereby authorize you to receive from the United States Trust Company of New York all securities and property coming to me under the decree or order on the settlement of its account and to transfer such securities and property to yourself as trustee under agreement of trust bearing even

date herewith executed by me to you." 238 N.Y. at 484, 144 N.E. at 687. The accounting in the testamentary trust proceeding was completed the following month, but the settlor of the inter vivos trust, Helen C. Bostwick, died before more than $1.4 million of the stock to which she was entitled could be transferred to her trustee. The litigation arose from a dispute between the legatees under her will and the remaindermen under the trust. Holding for the legatees, Judge Cardozo wrote for the Court as follows:

> In the deed [of trust] there is a present transfer of $5000 and no more. This wrought, there is merely the reservation of a privilege to augment the subject-matter of the trust by deliveries thereafter. The absence of words of present assignment is emphasized when we consider with what simplicity an assignment could have been stated. All that was needed was to expand the description by a phrase: "the right, title and interest of the grantor in the securities and other property due or to become due from the United States Trust Company as trustee under the will.".... Again words of present transfer are conspicuously absent. What we have instead is a request or at best a mandate, incompetent without more to divest title or transfer it, serving no other purpose than a memorandum of instructions from principal to agent as a guide to future action. [citations omitted] Deed and documents were prepared by counsel learned in the law. With industrious iteration, they rejected the familiar formulas that would have given unmistakable expression to the transfer of a present title. With like iteration, they chose the words and methods appropriate to a gift that was conceived of as executory and future. We must take the transaction as they made it. The very facility with which they could have made it something else is a warning that we are not at liberty, under the guise of construction, to make it other than it is. [citation omitted] They were willing to leave open what they

might readily have closed. Death overtook the signer before the gap was filled. 238 N.Y. at 485–86, 144 N.E. 686.

In our case it was not death but regret that overtook the signer. The result is the same.

### V.

■ Defendants argue also that they relied reasonably on von Kaulbach's offer and actually participated in the will litigation at some expense to themselves, principally in the value of their time. The Foundation Trust agreement does require the trustees, defendants here, to participate as necessary in the litigation:

> The Trustees agree specifically to keep Hedda informed as to all important parts of the litigation[s], and current status, from time to time of each part of the litigations, and to make themselves available at all times for questions by Hedda which they can answer or which they will refer to counsel and obtain an answer for Hedda; the Trustees shall continue to cooperate with counsel and assist them as may be required for the speedy conclusion of the litigations and the administration of the estate....

(Seltzer Aff.Exh. C at 7–8) Both Houston and Rathbone agreed to come out of retirement to assist in the litigation, as well as to advance money, at 9% interest, to fund it. Keoseian claims to have donated thousands of hours of his time. They argue that their reasonable reliance on her promise and their ensuing change of position was an acceptance of von Kaulbach's offer of 75% of her legacy to the proposed Foundation, and therefore her promise is now enforceable because she did not revoke her offer until 1987, after the defendants already had performed in reliance. *See Restatement (Second) of Contracts* § 90 (1981).

At the outset, we should put aside the line of charitable subscription cases, such as *I. & I. Holding Corp. v. Gainsburg,* 276 N.Y. 427, 433, 12 N.E.2d 532 (1938) and *Allegheny College v. National Chautauqua Cty. Bank,* 246 N.Y. 369, 159 N.E. 173 (1927), which hold that charities enjoy a favored status under New York law, such

that a charitable subscription is enforceable without consideration if the charity changes position in reliance on a donor's promise to contribute. Here, it was not the Foundation that allegedly relied on von Kaulbach's promise; indeed, the Foundation did not and does not exist. It was the prospective trustees who allegedly relied.

The issue is not whether, if the facts alleged by defendants are true, and assuming New York law applies, there was some contractual obligation from von Kaulbach to defendants; assuredly, there was. Rather, the issue is whether on these facts defendants would be entitled to the benefit of their alleged bargain, and thus to compel von Kaulbach to authorize Quappi's executors to fund the Foundation.

■ Although at one time only conventional contract remedies were employed when a plaintiff proved detrimental reliance on a promise, *see, e.g.*, Williston, *IV American Law Institute Proceedings*, Appendix p. 103 (1926), recent authority appears to follow Professor Corbin's advice to "make the remedy fit the crime," with the result that remedies are tailored to suit the circumstances of the case. *Corbin on Contracts One Volume Edition* § 205 at 294 (1952). In New York the proper measure of damages to a plaintiff who alleges detrimental reliance is the value of plaintiff's performance:

> Whether denominated "acting in reliance" or "restitution," all concur that a promisee who partially performs (e.g., by doing work in a building or at an accelerated pace) at a promisor's request should be allowed to recover the fair and reasonable value of the performance rendered, regardless of the enforceability of the original agreement.

*Farash v. Sykes Datatronics, Inc.*, 59 N.Y.2d 500, 506, 465 N.Y.S.2d 917, 920, 452 N.E.2d 1245, 1248 (1983). Thus, although the plaintiff in *Sykes* was barred by the statute of frauds from enforcing an alleged contract to extend a lease, despite alleged detrimental reliance, he was not barred from seeking the value of the work he performed assertedly as a result of that reliance.

Similarly here, for the reasons set forth above in section IV, although defendants are barred from enforcing von Kaulbach's uncompleted transfer, they may be able to recover the value of what they say were their services to her as a result of their alleged reliance. However, that measure of damages is not at issue in this action. All that is at issue is whether the Foundation Trust agreement may be enforced as written. For the above reasons, it may not.

Accordingly, plaintiff's motion for summary judgment declaring the Foundation Trust agreement unenforceable is granted.

SO ORDERED.