■ In the Matter of ALGEMENE BANK NEDERLAND N.V., Appellant, v MARCELLE B. TOEPFER, Respondent.—Appeal from judgment, Supreme Court, New York County (Elliott Wilk, J.), entered May 31, 1990, which denied the petition pursuant to CPLR 5206 (e) to compel the sale of shares representing

respondent's interests in a cooperative apartment is held in abeyance pending a hearing, before the court which rendered the judgment, on the issue of whether or not respondent's delivery to petitioner of the stock was conditioned on petitioner's promise that it would not disturb respondent's occupancy of the apartment during her lifetime.

Over the course of a period extending from September 1983 to March 1985, petitioner loaned in excess of $1,750,000.00 to S. Toepfer, Inc. (corporation), a New York corporation, operated as a family business, whose principals included Mr. Abraham E. Toepfer (now deceased), the respondent, who is his widow, and their adult sons, Howard and Steven.

On or about September 20, 1983, the corporation, by Howard Toepfer, executed a General Liability Agreement (Agreement), as security for loans and other accommodations received from petitioner, and granted petitioner a security interest in collateral, broadly defined to include, among other things, all "property, rights and interests * * * which at any time shall come into possession or custody or under the control of [petitioner]". Further, in conjunction with the execution of the Agreement, on the same day, the respondent and her sons individually executed an unconditional Guaranty of the indebtedness of the corporation, and, pursuant to the terms of that Guaranty, each guarantor granted to the petitioner a security interest in and a general lien upon any "property rights and interests of the undersigned [guarantor], which at any time shall come into the possession, custody or control of the [petitioner]". Both the Agreement and Guaranty provided that their terms could only be changed or revoked or modified by a writing.

About two years later, at the request of the petitioner, respondent executed a letter of Pledge (Pledge), dated October 10, 1985, pledging the 530 shares, allocated to the cooperative apartment she owned, located at 870 United Nations Plaza, apartment 13-A, Manhattan, to the petitioner, as collateral security for the corporation's indebtedness. In addition, on the same day, the respondent assigned to the petitioner the proprietary lease to that apartment.

The Pledge, prepared by the petitioner, contains a paragraph, which states in pertinent part, that, "Notwithstanding Pledgee's [petitioner's] rights in the Collateral pursuant hereto, Pledgee hereby consents and agrees that Pledgor [respondent] shall have the lifetime right to occupy the aforementioned Apartment * * * and to exercise all the rights of a shareholder of the Collateral", subject to various conditions

largely directed to insuring that respondent fulfilled her obligations as a shareholder in the cooperative thereby insuring the integrity of those shares. Indeed, the language relied upon by the dissent regarding possible foreclosure or sale expressly refers to such contingencies as being by "other than the Pledgee" which is supportive of respondent's, rather than petitioner's, position.

More than three years later, in November 1988, the petitioner claims that, due to a change in the law, it filed a UCC financing statement, in order to perfect a security interest in the shares of the apartment. Also, at about the same time, the petitioner sought and received, in December 1988, from respondent's sons the actual stock certificates representing respondent's ownership interest in the apartment.

After the corporation defaulted, in March 1989, the petitioner sought repayment from respondent and her sons, based upon their 1983 Agreement and Guaranty, but payment was not made. By summons and complaint, dated March 31, 1989, petitioner commenced an action against the corporation, respondent, and her sons to recover that debt. Subsequently, upon the basis of the default of respondent and her sons, in May 1989, petitioner obtained a judgment in the total amount of $1,781,578.81.

Since petitioner was unable to otherwise collect on that judgment, in June 1989, petitioner instituted, pursuant to CPLR 5206 (e), the instant special proceeding to compel the sale of the shares, representing the proprietary interest of respondent in the apartment, valued at $900,000.00, to satisfy the judgment.

In response, the respondent, by separate affidavits submitted by her sons, opposed the petition, contending in substance, that petitioner requested the stock certificates as additional security for the corporate debt, and respondent, suffering from various illnesses and infirmities including colon cancer, a hip fracture and bilateral cataract extractions, gave up the stock certificates in exchange for a promise made by Ms. Florence D. Nolan, Vice President and Legal Counsel of the petitioner, to respondent's sons that respondent "would never be disturbed from occupying her co-op apartment during her lifetime, and that so long as [respondent] was alive the Petitioner would never take any action against that apartment". This, of course, appears consistent with the previously quoted language contained in the Pledge.

Petitioner, by affidavit of Ms. Nolan denies that any promise

was made in exchange for receiving respondent's shares. Specifically, Ms. Nolan stated "Let me emphasize that, despite the statements of Howard and Steven Toepfer to the contrary, *there was no quid pro quo* when the stock certificates were delivered. I never represented to any of the defendants that the [petitioner] would not seek possession of the Coop in the event of a default while the Respondent was still living".

The motion court denied the petition, in substance, upon the basis of the competing affidavits of the parties, finding that the petitioner must have been aware that respondent surrendered the shares because she believed the petitioner would allow her to occupy the apartment for the remainder of her lifetime.

Although the Agreement and Guaranty, executed in 1983, contain provisions stating that the terms of those writings can only be changed, or revoked or modified by a writing, the Court of Appeals has held "[p]artial performance of an oral agreement to modify a written contract, if unequivocally referable to the modification, avoids the statutory requirement of a writing" *(Rose v Spa Realty Assocs.,* 42 NY2d 338, 341 [1977]; *see also,* General Obligations Law § 15-301 [1]).

In light of the language in the Pledge and the fact that the actual delivery of the shares concededly took place as a result of an oral request by petitioner, we find that the self-serving affidavits of the parties concerning the nature of that oral request are insufficient to permit a determination of whether the motion court abused its discretion in denying petitioner relief and that an evidentiary hearing is necessary on the issue of whether the respondent delivered to petitioner the stock certificates to her apartment with the specific understanding that petitioner would not disturb respondent's occupancy of the apartment during her lifetime. Accordingly, the appeal is held in abeyance pending the results of such hearing. Concur—Ellerin, Ross and Rubin, JJ.

Murphy, P. J., and Milonas, J., dissent in a memorandum by Milonas, J., as follows: In my opinion, the judgment being appealed herein should be reversed and the petition granted.

On September 20, 1983, S. Toepfer, Inc., a company whose principals included Steven Toepfer, Howard Toepfer, A. E. Toepfer, their father, who is now deceased, and respondent Marcelle Toepfer, the latter's widow, entered into a general liability agreement which, in exchange for certain loans and other accommodations, granted petitioner Algemene Bank Nederland N.V. a security interest in collateral that included

all "property, rights and interests * * * which at any time shall come into the possession or custody or under the control of the Bank." Two years later, respondent executed a letter of pledge with respect to shares in two residential cooperative apartments owned by her in 870 United Nations Plaza in Manhattan as collateral security for the continued indebtedness of S. Toepfer, Inc. Respondent also delivered an assignment of lease pursuant to which she assigned the proprietary lease to the bank. Then, in 1988, upon advice of counsel, a UCC financing statement was filed on behalf of petitioner. After the bank's auditors suggested that the bank obtain possession of the stock certificates representing ownership in the cooperative unit, the bank's agents met with Steven and Howard Toepfer and procured the certificates.

However, S. Toepfer, Inc. defaulted in its obligations to the bank, and, by the time that legal action was commenced in March of 1989, the company's indebtedness had grown to more than $1.7 million. Moreover, the defendants in that matter never defended the lawsuit against them so the bank was granted a default judgment against Steven and Howard Toepfer, as well as respondent herein. After persistent and futile efforts to enforce the judgment, petitioner instituted this proceeding to compel the sale of the subject shares pursuant to CPLR 5206 since it appears to be the sole remaining asset. It should be noted that in his post-judgment deposition, respondent's son Howard, endeavoring to explain the disappearance of in excess of $5 million in corporate inventory, consisting primarily of diamonds, urged that $1 million of the gems had been consigned in 1986 to a man in Cyprus and was now "uncollectible", that another $1.8 million worth of diamonds was presented to his "kidnappers" as a ransom payment and that the remaining $3 million or so in diamonds was given to some unidentified Colombians in May of 1989 (the judgment had already been filed by this time) with no possibility of recovery.

Thus, respondent's opposition to the present petition must be considered in the background of the mysterious vanishment of a small fortune in gems while, simultaneously, respondent and her sons defaulted on nearly $2 million owed to petitioner bank. At the very least, respondent's unsupported, self-serving claim, advanced through Steven and Howard Toepfer, that petitioner had orally represented not to interfere with her possession of the premises during her life time is scarcely convincing. The letter of pledge itself expressly conditions her right to occupancy upon the following: "(i) Pledgor shall not

be in default of any of her obligations hereunder or breach any covenant contained in a certain proprietary lease between 870 East Tower, Inc. and the Undersigned dated September 30, 1970; and (ii) Pledgor shall timely pay all obligations arising out of her ownership of the shares allocated to the apartment, or, if such shares have been sold or otherwise transferred to the Pledgee or to a third party, pay as rent to the owner of such shares, on a monthly basis, amounts sufficient to pay all such charges."

The instrument proceeds to provide that respondent's right to remain in the apartment shall terminate, in part, upon her failure to satisfy any of the foregoing requirements. Clearly, one of her obligations under the letter of pledge, indeed the primary necessity, is that there be compliance with the general liability agreement. It should also be reiterated that pursuant to this 1983 agreement, the bank already was accorded a security interest in the subject cooperative apartment(s), and the ensuing letter of pledge, assignment of lease and gaining control over the stock certificates did not create petitioner's rights with respect to this property but merely served to transfer physical possession of the relevant documents. However, under no reasonable construction of the letter of pledge can the bank be found to have limited its right to dispose of the property as it deemed appropriate during respondent's life even in the event of a default. Indeed, the letter of pledge specifically states that the pledgor's occupancy shall also terminate "upon any foreclosure, sale, assignment, subletting or destruction of the Apartment or any eviction of Pledgor from the Apartment for any reason and by any agency other than the Pledgee if the liabilities to the Pledgee are not satisfied unless Pledgee otherwise consents in writing." Since this instrument certainly contemplates the possibility of a foreclosure or sale, it is simply illogical to take out of context the phrase, "Pledgee hereby consents and agrees that Pledgor shall have the lifetime right to occupy the aforementioned Apartment 13A", without setting alongside it the conditions which explain these words, in order to discern some sort of contractual ambiguity. Further, it makes even less sense to accept respondent's conclusory allegation of an oral promise as a basis to preclude judgment to petitioner, particularly in view of section 15-301 (1) of the General Obligations Law, which declares that: "A written agreement or other written instrument which contains a provision to the effect that it cannot be changed orally, cannot be changed by an executory agreement unless such executory agreement is

in writing and signed by the party against whom enforcement of the change is sought or by his agent."

In the instant situation, the guaranty accompanying the general liability agreement includes, in unequivocal terms, a statement that it is "a continuing guaranty which shall remain in force until a notice written by the undersigned, revoking or modifying the same, shall have been received by the Bank" *(see also, Chemical Bank v Wasserman,* 37 NY2d 249, for the proposition that a purported oral representation is completely ineffectual to avoid operation of a written guaranty that bars modification or termination except in writing). Moreover, the Court of Appeals, in *Citibank v Plapinger* (66 NY2d 90), held that a guarantor under an unconditional guaranty, such as the one at issue herein, may not raise as a defense oral representations that contradict the terms of the guaranty even to the extent of claiming fraudulent inducement. In fact, the majority's decision to affirm the judgment of the Supreme Court in this proceeding is so contrary to fundamental and widely acknowledged tenets of commercial law that it could, if left undisturbed, have a dire impact on common business practices.