OPINION OF THE COURT
 

 Chief Judge Kaye.
 

 In October 1987, Westend Property Associates, a partnership in the business of promoting the conversion of Manhattan apartment buildings from rental to cooperative status submitted an offering plan seeking to convert a residential building located on Manhattan’s Upper West Side. As sponsor for the conversion, Westend, whose general partner was Jerry Donatelli, retained title to 12 of the unsold apartments and defendant, 306-100th Street Owners Corporation, became the owner of the building itself.
 

 A year and a half later, on March 6, 1989, Diversified Realty Financial Partners Limited Partnership — an entity also controlled by Donatelli, and the assignee of Westend’s interest in the 12 unsold apartments — obtained a $12.75 million loan from plaintiff Friesch-Groningsche Hypotheekbank Realty Credit Corporation (FGH), a German bank licensed to do business in New York. Along with a promissory note evidencing the loan, Diversified entered into a security agreement, signed by Donatelli in his capacity as general partner, and dated March 6, 1989, whereby it pledged to plaintiff as collateral for the loan "a first and prior security interest in * * * all of [Diversified’s] right, title and interest” in the 12
 
 *647
 
 cooperative apartments at 306 West 100th Street, along with unsold apartments it owned in 16 other buildings.
 

 After execution of the promissory note, the security agreement and the other related loan documents, plaintiff filed UCC-1 financing statements perfecting its security interest in the 12 apartments
 
 (see,
 
 UCC 9-304 [7]).
 

 In September 1989, five months after receiving the $12.75 million FGH loan, Diversified began defaulting on its maintenance payments to defendant for the 12 apartments. In order to preserve the value of its collateral, plaintiff began to cure the default by making these monthly payments so that by May of 1995, plaintiff had paid in excess of $630,000 in maintenance arrearages.
 

 By January of 1990, Diversified’s financial situation had further deteriorated and it began defaulting on the interest payable to plaintiff on the $12.75 million loan. On March 7, 1991, in accordance with the applicable provisions of the promissory note and security agreement, plaintiff exercised its right to accelerate the outstanding principal and accrued interest due (then in the range of $12.3 million). When Diversified failed to pay, plaintiff gave notice of its intent to foreclose on the 12 apartments
 
 (see,
 
 UCC 9-504). An auction took place on May 28, 1991, and plaintiff’s affiliate and designee submitted the highest bid at $498,000.
 

 Defendant, however, refused to transfer title to plaintiff, claiming that it had a senior security interest both as to any unpaid maintenance charges and as to any outstanding non-maintenance obligations resulting from Westend’s failure to perform certain renovation and repair work as agreed under the offering plan. According to defendant, this work — which was to have been completed within six months of the 1989 building conversion — consisted of plumbing, electrical and masonry repairs, as well as installation of a new roof and windows and refurbishment of the building’s elevator.
 

 Plaintiff commenced this action to compel defendant to transfer title to the shares. On the consent of the parties, plaintiff’s motion for a preliminary injunction was converted to one for summary judgment. Supreme Court granted summary judgment in favor of plaintiff and denied defendant’s cross motion, holding that plaintiff is the senior secured party with respect to the apartments. The Appellate Division, however, reversed, reasoning that defendant has the first, or "issuer’s” lien pursuant to UCC article 8 (191 AD2d 1). On
 
 *648
 
 remand, the trial court found that the unpaid maintenance obligation for the 12 apartments totalled $84,975 and the nonmaintenance obligation $676,755.
 

 In that the parties do not dispute either the fact that defendant has a senior security interest in outstanding maintenance payments or the accuracy of the amounts found by the trial court, we granted leave to decide the law question of which party has the senior security interest with respect to the nonmaintenance obligations. We now conclude that plaintiffs interest is superior.
 

 UCC 8-103, entitled "Issuer’s Lien,” provides that: "A lien upon a security in favor of an issuer thereof is valid against a purchaser only if * * * the security is certificated and the right of the issuer to such lien is noted conspicuously thereon.”
 

 As support for the proposition that it has an issuer’s lien in the nonmaintenance obligations, defendant points to a legend in the second full paragraph printed on the back of the stock certificates corresponding to the shares in the 12 apartments indicating that the "Corporation, by the terms of said By-laws and the proprietary lease, has a first lien on the shares represented by the certificate for all sums due and to become due under said proprietary lease.”
 

 Even if the coop certificates in question could be considered a "security” for purposes of UCC article
 
 *
 
 — a question we do not reach — no issuer’s lien was created securing defendant’s interest in
 
 nonmaintenance
 
 obligations arising with respect to the 12 apartments since the statutory predicate for an issuer’s lien under UCC 8-103 is that the alleged lien be "noted conspicuously” on the share certificates. Here, the only lien noted conspicuously on the certificates is one for all sums due under the proprietary lease. These sums, consisting primarily of maintenance and other regular common charges
 
 *649
 
 associated with cooperative apartment ownership, are not equivalent to the repair/renovation responsibilities of the sponsor at the time of the original building conversion. Nowhere on the legend is there any reference to defendant’s lien with respect to Westend’s obligations under the offering plan.
 

 In order to overcome the evident failure of the stock certificates themselves to provide adequate notice as to the existence of defendant’s alleged lien for nonmaintenance obligations, defendant points to the fact that the first full paragraph on the back of the stock certificates incorporates by reference the provisions of defendant’s bylaws, which state in pertinent part that defendant has "a first lien * * * for all indebtedness and obligations * * * arising under the provisions of any proprietary lease * * *
 
 or otherwise
 
 arising” (emphasis added).
 

 Though it is doubtful that the phrase "otherwise arising” is sufficiently specific to encompass the specific repair obligations of the sponsor under the offering plan, the strict notice requirements of UCC 8-103 do not permit a party to create what would essentially be a hidden hen by referring merely to the existence of a separate document on a stock certificate, without specifying in any way the particular language in that document which is applicable
 
 (compare, Allen v Biltmore Tissue Corp.,
 
 2 NY2d 534). Though the
 
 Allen
 
 Court noted that "a restriction is sufficiently 'stated’ by a legend noting that the stock is 'issued subject to restriction’ and specifying where its full text may be found”
 
 (id.,
 
 at 540 [citations omitted]), the failure of the share certificates to conspicuously indicate any lien other than that arising under the proprietary lease for unpaid maintenance charges not only fails to inform a potential creditor where to look for the existence of any other lien, but, as noted above, strongly implies that no such lien even exists. "If the issuer may not at the inception of its relation with the registered owner create a secret right in its own favor, much less may the issuer do so after the owner has used his certificates to obtain credit from a lender”
 
 (In re Hawaii Corp.,
 
 829 F2d 813, 815).
 

 No issuer’s lien having been established with respect to the nonmaintenance obligations under the circumstances presented, the judgment appealed from and the order of the Appellate Division brought up for review should be modified in accordance with this opinion, with costs to appellants, and, as so modified, affirmed.
 

 
 *650
 
 Judges Simons, Titone, Bellacosa, Smith, Levine and Ciparick concur.
 

 Judgment appealed from and order of the Appellate Division brought up for review modified in accordance with the opinion herein, with costs to appellants, and, as so modified, affirmed.
 

 *
 

 The question whether tenant-shareholders’
 
 sui generis
 
 ownership interests in cooperative apartments are UCC article 8 securities
 
 (Matter of State Tax Commn. v Shor,
 
 43 NY2d 151, 154) has vexed courts — both State and Federal — in varying contexts
 
 (see, First Sav. Bank v Barclays Bank,
 
 618 A2d 134 [DC];
 
 Presten v Sailer,
 
 225 NJ Super 178, 542 A2d 7;
 
 Silverman v Alcoa Plaza Assocs.,
 
 37 AD2d 166 [1st Dept];
 
 In re McNair,
 
 90 Bankr 912 [ND 111];
 
 Superior Fin. Corp. v Haskell,
 
 556 F Supp 199 [SD NY]). Indeed, while not presented by the facts before us, a related issue concerns the proper method for the cooperative corporation to perfect its lien with respect to outstanding maintenance charges
 
 (see, e.g.,
 
 Siegler,
 
 Collecting Rental Arrears,
 
 NYLJ, Mar. 1, 1995, at 3, col 1; DiLorenzo,
 
 Sponsor Defaults,
 
 NYLJ, Feb. 23, 1990, at 2, col 3;
 
 Saada v Master Apts.,
 
 152 Misc 2d 861).