**In re Joseph S. LEFRAK, Debtor.**

**Alexander SCHACHTER, as Trustee of the Estate of Joseph Lefrak, Plaintiff,**

**v.**

**Susan LEFRAK, Joseph S. Lefrak and 983 Tenants Corp., Defendants.**

**Bankruptcy No. 96 B 43478(SMB).**
**Adversary No. 96/9393A.**

United States Bankruptcy Court, S.D. New York.

Jan. 21, 1998.

---

Alexander Schachter, New York City, for Plaintiff.

Sherman, Citron & Karasik, P.C. (Howard Karasik, of counsel), New York City, for Susan and Joseph Lefrak.

Richman & Fingerhut (Michael A. Richman, of counsel), New York City, for 983 Tenants Corp.

## POST–TRIAL MEMORANDUM DECISION

STUART M. BERNSTEIN, Bankruptcy Judge.

The chapter 7 trustee commenced this adversary proceeding to recover title to the shares and proprietary lease pertaining to a cooperative apartment. The debtor originally acquired the shares and lease in his own name. He contends that he transferred a 50% interest to his wife in 1984 (the "1984 Transfer"), and the remaining 50% interest in 1994 (the "1994 Transfer"). The trustee contends that the purported transfers were never completed, but if they were, they are avoidable.

At the conclusion of the September 9, 1997 trial, I ruled that the 1994 Transfer was ineffective, and the debtor's wife had failed to prove a basis for imposing a constructive trust in her favor. (*See* Trial Transcript ("Tr.") 105–06.) I now conclude that the 1984 Transfer was also ineffective. Accordingly, the debtor owned the entire interest in the cooperative apartment on the petition date, and the trustee may sell this interest pursuant to 11 U.S.C. § 363.

## BACKGROUND

The defendants, Joseph S. Lefrak ("Joseph"), an attorney, and Susan Lefrak ("Susan") married in September 1952, (Tr. 27), and moved into apartment 14D at 983 Park Avenue ("Apartment") in Manhattan in 1976. (*Id.* at 28.) In 1982, the building converted to cooperative ownership, and the defendant 983 Tenants Corp. (the "Corporation") became the owner. Joseph "bought" the Apartment. He received a certificate evidencing his ownership of 919 shares in the Corporation (Plaintiff's Exhibit ("PX") C), and entered into a proprietary lease with the Corporation to occupy the Apartment.[1] Joseph financed his purchase, in part, with a loan from Dime Savings Bank ("Dime"), pledging his shares and proprietary lease as security for repayment. (Tr. 30.) Thereafter, Dime retained possession of the share certificate. There is no evidence that Susan was liable for repayment of the Dime loan, and as discussed below, there is evidence that she was not.

### The 1984 Transfer

In 1984, Joseph decided to give Susan a 50% ownership interest in the Apartment. This involved transferring his 100% interest to himself and Susan as joint tenants with rights of survivorship. Paragraph 16(a)[2] of

---

1. The copy of the lease received in evidence as PX A is unsigned, but there is no dispute that Joseph alone signed it.

2. Paragraph 16(a) provides, in relevant part:

(a) The Lessee shall not assign this lease or transfer the shares to which it is appurtenant or any interest therein, and no such assignment or transfer shall take effect as against the Lessor for any purpose, until

(i) An instrument of assignment in a form approved by Lessor executed and acknowledged by the assignor shall be delivered to the Lessor; and

(ii) An agreement executed and acknowledged by the assignee in a form approved by Lessor assuming and agreeing to be bound by all the covenants and conditions of this lease to be performed or complied with by the Lessee on and after the effective date of said assignment shall have been delivered to the Lessor, or, at the request of the Lessor, the assignee shall have surrendered the assigned lease and entered into a new lease in the same form for the remainder of the term, in which case the Lessee's lease shall be deemed cancelled as of the effective date of said assignment; and

(iii) All shares of the Lessor to which this lease is appurtenant shall have been transferred to the assignee, with proper transfer taxes paid and stamps affixed; and

. . . .

the proprietary lease establishes certain formalities as a condition to transfer of the shares and lease. In some cases, it also requires the Corporation's consent. The assignor must deliver an executed assignment to the Corporation, (¶ 16(a)(i)), the assignee must deliver an executed agreement to the Corporation under which she agrees to assume and be bound by the terms and covenants of the proprietary lease (*i.e.*, an acceptance and assumption agreement), (¶ 16(a)(ii)), and the assignor's shares must be "transferred to the assignee, with proper transfer taxes paid, and stamps affixed." (¶ 16(a)(iii)). If the transfer is not between spouses, the parties must also obtain the consent of the Corporation. (¶ 16(a)(v)).

Joseph failed to comply with the terms of the proprietary lease; he confused the separate requirements of formality and consent. Sometime in 1984, Joseph contacted Dime— who held the share certificate—to obtain its consent to the transfer of the shares. Dime advised Joseph to obtain the consent of the Corporation. On September 17, 1984, Joseph wrote to the president of the Corporation, requesting its consent to the transfer of his shares to himself and Susan jointly. (Defendants Lefraks' Exhibit ("DX") 1.) By letter dated October 3, 1984, the Corporation gave its consent, noting, however, that "[p]ursuant to Paragraph 16a(v) of the Proprietary Lease it would seem that this consent is superfluous." (DX 2.) To this point Joseph had not executed an assignment of the lease, and Joseph and Susan had not executed an acceptance and assumption agreement.

Armed with the October 3, 1984 letter, Joseph wrote to Dime requesting Dime's consent to the transfer of share ownership to himself and Susan jointly, with right of survivorship. (DX 4.) He enclosed the October 3 letter in addition to the results of a judgment and lien search on Susan and a check covering Dime's processing fees. Dime wrote back that it was in receipt of the "necessary documentation in order to change title," and was forwarding the documents to its attorneys, Jackson & Nash. (DX 5.) On December 18, 1984, an associate in Joseph's law firm wrote to Jackson & Nash. She asked Dime's counsel (1) to forward any documentation that had to he executed to effectuate the transfer and (2) to call to schedule a closing, if one was necessary. (DX 5.)

Inexplicably, the matter lay dormant for the next three years. There is no evidence that Joseph again communicated with Dime or the Corporation until September 2, 1987. On that day, Joseph wrote to Ms. Meryl Sacks at M.J. Raynes, Inc., evidently the Corporation's managing agent. (PX D.) He acknowledged that he was the sole owner of the shares, and requested a transfer of the shares from himself to himself and Susan, as joint tenants.

In September 1987, Joseph also wrote to Dime, again requesting permission to add Susan's name to the share certificate. On September 17, 1987, Dime wrote back, *inter alia*, "requesting various documents necessary in order to add his wife's name *on the co-op loan.*" (DX 7)(Emphasis added.)[3] Dime's request indicates that Susan was not liable for repayment of the loan. Further, Dime understandably would not consent to the transfer of its collateral unless Susan became liable for the debt secured by the collateral.

On or about November 10, 1987, and for the first time, Joseph executed an assignment, and both he and Susan executed an acceptance and assumption agreement. An associate with Joseph's law firm transmitted these and other documents to Dime, (DX 6),

---

(v) Except in the case of an assignment, transfer or bequest to the Lessee's spouse, of the shares and this lease, and except as provided in Paragraph 38 of this lease, consent to such assignment shall have been authorized by resolution of the Directors, or given in writing by a majority of the Directors; or, if the Directors shall have failed or refused to give such consent within thirty (30) days after submission of references to them or Lessor's agent, then by lessees owning of record at least sixty-five (65%) percent of the then issued shares of the Lessor. Consent by lessees as provided for herein shall be evidenced by written consent or by affirmative vote taken at a meeting called for such purpose in the manner as provided in the By-Laws.

3. None of the parties introduced the September 1987 correspondence between Joseph and Dime. Their communications are reflected in a January 11, 1988 letter received in evidence as DX 7.

but the evidence does not establish that anyone ever transferred the assignment or the acceptance and assumption agreement to the Corporation.[4] The November 10 letter does not reflect that it transmitted documentation making Susan "liable on the co-op loan," although a letter from the same associate written on January 11, 1988, states that it did. (DX 7.)

By this time, a new problem arose. Dime apparently misplaced Joseph's loan file which contained both the stock certificate and the proprietary lease. On January 11, 1988, Joseph's associate again wrote to Dime, recounting the recent unsuccessful efforts to transfer the shares and the problem of the lost shares and lease. (DX 7.) According to this letter, a Dime officer had advised Joseph's associate five days earlier that if she could not locate the missing certificate and lease by the end of that day, she would prepare affidavits of lost certificate and lost proprietary lease, "so that we could proceed to obtain new documents to close this transaction." The letter ended with the request that Dime prepare the affidavits and send them to its counsel so that the parties could schedule a closing and "finalize this transaction."

The record does not reflect any subsequent communication or activity between Joseph and Dime. The parties never closed their transaction, and Dime never transferred or consented to the transfer of an interest in the shares to Susan.

**The 1994 Transfer**

In October 1992, the Lefraks separated, Joseph moved out and Susan continued to reside in the Apartment without him. (Tr. 29.) The Lefraks believed that despite the false starts and problems regarding the transfer, they owned the Apartment jointly. According to Joseph's testimony, they subsequently entered into an oral separation agreement pursuant to which, *inter alia*, Joseph agreed to transfer his remaining 50% interest to Susan. (*See* Tr. 40–41.) On October 24, 1994, Joseph wrote to the Corporation's president stating that he had "relinquished" his "one-half interest" in the shares and the proprietary lease, making Susan the sole owner. (DX 9.)

The only evidence of a response came two years later. By letter dated November 12, 1996, (DX 10), written after the commencement of this case, the Corporation reminded Joseph that it had previously approved the transfer of the Apartment from his name alone to him and Susan jointly. Moreover, "[a]lthough the ministerial act of effecting that transfer never occurred, it was the cooperative's intent that the transfer take place." It concluded, however, that because of the bankruptcy, no transfer could take place without bankruptcy court approval.

## DISCUSSION

### A. Introduction

■ The only remaining issue in this matter concerns the effectiveness of the 1984 Transfer. If it was effective, Joseph and Susan owned the Apartment jointly on the petition date. If it was not effective, Joseph's 100% interest became property of the estate, and the trustee may sell it. The parties' interests in the Apartment must be determined in accordance with state law. *Butner v. United States*, 440 U.S. 48, 55, 99 S.Ct. 914, 918, 59 L.Ed.2d 136 (1979).

■ The nature of cooperative apartment ownership is *sui generis*. The owner holds shares in the corporation that owns the apartment building, and his share ownership entitles him to a proprietary lease. *State Tax Comm'n v. Shor*, 43 N.Y.2d 151, 400 N.Y.S.2d 805, 806, 807–08, 371 N.E.2d 523, 524, 526 (1977); *see In re Estate of Carmer*, 71 N.Y.2d 781, 530 N.Y.S.2d 88, 525 N.E.2d 734, 735 (N.Y.1988)(interest represented by the shares is in reality a right to possess real property). The shares and lease are inseparable; the transfer of one without the other would be futile, and therefore ineffective. *United States v. 110–118 Riverside Tenants Corp.*, 886 F.2d 514, 517–18 (2d Cir.1989), *cert. denied*, 495 U.S. 956, 110 S.Ct. 2560, 109 L.Ed.2d 743 (1990); *see Bell v. Alden Owners, Inc.*, 199 B.R. 451, 463 (S.D.N.Y.1996); *cf. Swatzburg v. Swatzburg*, 137 Misc.2d 1042, 523 N.Y.S.2d 399, 399–400 (N.Y.Sup.Ct.

---

**4.** At trial, Joseph only speculated that the documents were delivered. (*See* Tr. 80.)

1987) (judgment creditor cannot execute on co-op shares, as distinct from the proprietary lease). Here, the proprietary lease reflects this requirement.

 The Lefraks contend, in substance, that Joseph gave Susan an *inter vivos* gift of a 50% joint interest in the Apartment in 1984, or at the latest, 1987. Under New York law, the three elements of an *inter vivos* gift are donative intent, delivery, and acceptance. *Muserlian v. Commissioner of Internal Revenue*, 932 F.2d 109, 113 (2d Cir. 1991); *Gruen v. Gruen*, 68 N.Y.2d 48, 505 N.Y.S.2d 849, 852–53, 496 N.E.2d 869, 872 (1986); *In re Estate of Szabo*, 10 N.Y.2d 94, 217 N.Y.S.2d 593, 594–95, 176 N.E.2d 395, 396 (1961); *In re Van Alstyne*, 207 N.Y. 298, 100 N.E. 802, 805 (1913). The party assert-ing the gift must establish each element clearly and unambiguously. *von Kaulbach v. Keoseian*, 783 F.Supp. 170, 175–76 (S.D.N.Y. 1992); *Mortellaro v. Mortellaro*, 91 A.D.2d 862, 458 N.Y.S.2d 390, 390 (4th Dep't 1982); *see Midland Ins. Co. v. Friedgood*, 577 F.Supp. 1407, 1412 (S.D.N.Y.1984)(the proof must be scrutinized carefully and critically).

The record supports a finding of both donative intent and acceptance. It contains correspondence expressing Joseph's desire to effect the transfer, (DX 1, 4, 5; PX D), and Susan's acceptance, (DX 6, letter dated Nov. 21, 1984.) Moreover, in late 1987, Joseph executed an assignment of the proprietary lease, (DX 6), and both he and Susan executed an acceptance and assumption of the proprietary lease. (*Id.*)

 The defendants must also prove, however, that Joseph delivered his 50% interest to Susan.[5] Delivery need only be "as perfect as the nature of the property and the circumstances and surroundings of the parties will reasonably permit." *Gruen v. Gruen*, 505 N.Y.S.2d at 854, 496 N.E.2d at 874 (quoting *In re Estate of Szabo*, 217 N.Y.S.2d at 594–95, 176 N.E.2d at 396). It must, however, reach the "point of no re-turn," and the donor must surrender domin-

ion and control irrevocably to the donee. *In re Estate of Szabo*, 217 N.Y.S.2d at 594–95, 176 N.E.2d at 396; *see also Gruen v. Gruen*, 505 N.Y.S.2d at 854–55, 496 N.E.2d at 874; *In re Van Alstyne*, 100 N.E. at 805; *Beaver v. Beaver*, 117 N.Y. 421, 22 N.E. 940, 941 (1889).

 Initially, the proof that Joseph "deliv-ered" the proprietary lease is equivocal. Jo-seph delivered a fully executed lease assign-ment to Dime, (DX6), but there is no proof that he transmitted it to Susan or the Corpo-ration. Assuming, however, that Joseph ef-fectively delivered the proprietary lease, he also had to deliver the share certificate to complete the *inter vivos* gift of the 50% interest. As already noted, the shares and lease are inseparable, and the attempt to transfer one without the other is ineffective. *United States v. 110–118 Riverside Tenants Corp.*, 886 F.2d at 517–18.

### B. The Delivery of the Share Certificate

 A share certificate is not an inter-est in property, but only evidence of an inter-est. *Elyachar v. Gerel Corp.*, 583 F.Supp. at 918. As a rule, the donor must physically deliver the share certificate to deliver the underlying interest. *See In re Ruszkowski's Estate*, 45 Misc.2d 380, 256 N.Y.S.2d 983, 985–86 (N.Y.Surr.Ct.1965) (citing cases); *Reinhard v. Sidney S. Robey Co.*, 110 Misc. 152, 179 N.Y.S. 781, 783 (N.Y.Sup.Ct.), *aff'd*, 193 A.D. 926, 184 N.Y.S. 946 (4th Dep't 1920). Physical delivery is not, however, always practical. For example, the donor may re-tain a life or joint interest, and accordingly, desire to retain the share certificate. Under those circumstances, how does the donor re-tain the certificate but surrender dominion and control?

The New York Court of Appeals answered this question in the leading case of *In re Estate of Szabo*, 10 N.Y.2d 94, 217 N.Y.S.2d 593, 176 N.E.2d 395 (1961). There, the dece-dent's stock split 3–1. She endorsed one of her four certificates to herself and the peti-

---

**5.** The donor can give a partial interest in proper-ty. *See In re Estate of Szabo*, 217 N.Y.S.2d at 594–95, 176 N.E.2d at 396 (gift of joint interest in shares); *Gruen v. Gruen*, 505 N.Y.S.2d at 852–55, 496 N.E.2d at 872–74 (present gift of remain-

der interest, with donor reserving a life estate); *Elyachar v. Gerel Corp.*, 583 F.Supp. 907, 917–20 (S.D.N.Y.1984) (Sofaer, J.) (gift of beneficial in-terest in shares, with donor retaining manage-ment control of the corporation).

tioner as joint tenants with right of survivorship. She retained all four certificates, and directed her niece to have the company transfer all of the stock to joint ownership on the corporate books, but only when new, post-split certificates became available. The decedent died three days before the corporation issued the new certificates.

The Court of Appeals acknowledged that one who gives a part interest in shares is likely to retain the certificates, and a symbolic delivery will suffice.[6] *Id.* at 594–95, 176 N.E.2d at 396. However, without physical delivery, the gift is not complete until the corporation records the transfer on its books:

> [E]ven [symbolical] delivery must proceed to a point of no return, and this point can only be reached when there is a transfer of record on the stock books of the company. Obviously the donor does not surrender dominion and control of a part interest until the transfer of record is made because up until that time he may change his mind and withdraw his directive to the transfer agent.

*Id.* at 595, 176 N.E.2d at 396; *accord Kaulbach v. Keoseian,* 783 F.Supp. at 176; *Elyachar v. Gerel Corp.,* 583 F.Supp. at 918; *Clarkson Co. v. Shaheen,* 533 F.Supp. 905, 921–22 (S.D.N.Y.1982); *see In re Carroll,* 100 A.D.2d 337, 474 N.Y.S.2d 340, 344 (2d Dep't 1984) (transfer on corporate books divested donor of control, despite his retention of the share certificate); *In re Estate of Cristo,* 86 A.D.2d 700, 446 N.Y.S.2d 555, 556–57 (3d Dep't 1982) (failure to complete stock transfer ledger or certificate stubs is determinative where the donor retains beneficial interest in the shares represented by the certificates).

The Court of Appeals in *Szabo* concluded that there was no *inter vivos* gift. The corporation did not record the transfer during the decedent's lifetime, and her death revoked the transfer agent's authority to make the transfer of record. 217 N.Y.S.2d at 594–95, 176 N.E.2d at 396–97. This conclusion extended to the certificate that the decedent had actually endorsed. Although this was evidence of the decedent's intent, it was not sufficient to complete the symbolic delivery. Until her death, she could revoke the transfer agent's authority to complete the transfer. *Id.*

 Here, Joseph never delivered the shares to Susan. They remained in Dime's possession at all times. It is true that Joseph would not have been expected to make actual physical delivery because he retained a joint interest with Susan.[7] Nevertheless, he also failed to make a symbolic delivery of the shares. None of the writings in evidence expresses a present intention to make a gift of the interest. The various letters sent by Joseph or his associates refer prospectively to his desire to make a transfer, and not to an antecedent or contemporaneous transfer. (*See* DX 1, 4, 7.)

More important, the Corporation never recorded the transfer on its stock records.[8] If

---

6. For example, a symbolic delivery would occur where the donor does not deliver the property, but instead, delivers an instrument that expresses a present transfer of the property (as opposed to a future transfer). *See, e.g., In re Estate of Monks,* 171 Misc.2d 514, 655 N.Y.S.2d 296, 299–300 (N.Y.Surr.Ct.1997).

7. I had raised the issue of whether Article 8 of New York's Uniform Commercial Code ("U.C.C.") governs the transfer of Joseph's co-op shares, and if it does, whether Joseph satisfied its terms. The first question is unresolved. *See ALH Properties Ten, Inc. v. 306–100th St. Owners Corp.,* 86 N.Y.2d 643, 635 N.Y.S.2d 161, 163, 658 N.E.2d 1034, 1036 (1995) (refusing to decide whether a co-op share certificate is a "security" within the meaning of Article 8 of the U.C.C.). The second question must be answered in the negative. If Article 8 does apply, Joseph failed to effect a delivery under its terms. The shares would be "certificated securities." Since Dime acted as a pledgee and not as a "financial intermediary" with respect to the shares, *see* N.Y.U.C.C. § 8–313(4) (McKinney 1990) (defining "financial intermediary"), the U.C.C. recognizes only two methods of transfer. First, the transferee may acquire possession. U.C.C. § 8–313(1)(a). Second, if the securities are held by a third party, the third party must acknowledge that it holds the certificated security for the new owner. *Id.,* § 8–313(1)(e). Joseph and Susan never acquired possession of the share certificate; it always remained in Dime's possession. Further, Dime never acknowledged that it held the certificate for Joseph and Susan as joint owners.

8. The Lefraks point to the Corporation's letters dated October 3, 1984 (DX 2), and November 12, 1996 (DX 10) as evidence that the Corporation's

this leads to a result Joseph did not intend, he must accept the blame. Both the Corporation and Dime were amenable to the idea of the transfer. But after initiating the transfer process in 1984, Joseph abandoned it for three years. By the time that the Lefraks executed an assignment and an acceptance and assumption of the proprietary lease in 1987, the Dime file, which had been transmitted to Jackson & Nash in 1984, had been misplaced. In early 1988, Joseph finally abandoned all efforts to complete the transfer process.[9]

As a result, Joseph retained dominion and control over the entire interest in the Apartment. Prior to bankruptcy, Joseph could have satisfied the Dime loan and recovered the shares and proprietary lease. He could have executed a new assignment of the lease, endorsed the share certificate, and delivered both to a third party purchaser. Assuming that the purchaser executed an acceptance and assumption agreement and the Corporation consented to the transfer, the purchaser would become the new shareholder and proprietary lessee. Under the Corporation's by-laws, (art. VI, § 4),[10] the purchaser would be entitled to surrender Joseph's endorsed certificate, and compel the Corporation to record the transfer on its records. In essence, he could have transferred the shares and lease without Susan's knowledge or consent.

One case that the Lefrak's cite nevertheless upheld the transfer of an interest despite the absence of physical delivery or recordation. In *Chiaro v. Chiaro*, 213 A.D.2d 369,

623 N.Y.S.2d 312 (2d Dep't), *appeal denied*, 86 N.Y.2d 708, 634 N.Y.S.2d 442, 658 N.E.2d 220 (1995), the wife in a divorce action claimed that her husband's parents had given a cooperative apartment to the couple during their marriage. The parents denied the gift. Moreover, they never delivered the share certificate, (*id.*, 623 N.Y.S.2d at 314), and the opinion implies that the corporation never recorded the transfer to the donees.[11]

The court nevertheless concluded that the parents had made a constructive delivery of the interest, "sufficient to divest the [donors] of dominion and control over the unit." *Id.* The donees resided in the apartment for nearly their entire marriage, they made expensive renovations to the apartment, they voted at co-op board meetings with the knowledge of the parents, and at certain meetings, one of the parents voted a proxy signed by the couple. *Id.*

██ The *Chiaro* court's conclusion is hard to square with New York law, particularly since it did not cite *Szabo*. Clearly, no delivery occurred. It appears, instead, that the *Chiaro* court rested its finding of divestiture of dominion and control on some type of waiver or estoppel. Waiver is discussed below, and to the extent that estoppel can substitute for the delivery requirements under *Szabo*, the doctrine is not applicable in this case. There is no proof that the Corporation represented to the Lefraks that they owned the Apartment jointly,[12] or that the

records reflect a completed transfer. The first, (DX 2), simply gives consent to the transfer but acknowledges that consent is unnecessary. The second, (DX10), actually confirms that the Corporation's records do *not* reflect the transfer. The Corporation's outside counsel wrote to Joseph that "although the ministerial act of effecting the transfer never occurred it was the cooperative's intent that the transfer take place." The Corporation's "intent" is consistent with its consent, but neither intent nor consent are material. Rather, the recordation of the transfer, which the letter calls "ministerial," is essential to effect delivery.

9. Joseph testified that when he learned of the missing Dime file, he prepared and forwarded an affidavit of lost certificate to the Corporation. (Tr. 78.) This testimony is not credible. Dime

lost the certificate and would have had to prepare the affidavit. (*DX* 7.) In addition, Joseph failed to produce any evidence of this affidavit at trial.

10. The Corporation's by-laws are part of the Offering Plan which was received in evidence as PX B.

11. If the donees were the record owners, the court could have easily decided the case on that basis.

12. For example, there is no proof that the Corporation sent annual statements to both Lefraks, as joint shareholders, setting forth the amount of mortgage interest or real estate taxes they could deduct for income tax purposes.

Lefraks changed their position under the mistaken belief that they did.[13]

## C. The Waiver of the Recordation Requirement

The Lefraks argue that even if recordation was necessary to complete the transfer of Joseph's interest, the Corporation waived the requirement. They conclude, therefore, that the transfer should be deemed to have occurred. This argument, however, misses the point. It confuses the formality requirements imposed under the proprietary lease with the delivery requirements imposed under state law with respect to the law of *inter vivos* gifts.

■ A corporation typically requires that stock transfers be recorded on its books. Such a requirement operates solely for the protection of the corporation, and lack of compliance does not prevent the passing of title in the shares as between the parties *provided that proper delivery has occurred. See Chemical Nat'l Bank v. Colwell,* 132 N.Y. 250, 30 N.E. 644, 645 (1892) (delivery complete upon transfer of certificate with assignment and power of transfer); *In re Estate of Cristo,* 446 N.Y.S.2d at 556 (delivery complete under U.C.C. Article 8); *In re Will of Katz,* 142 Misc.2d 1073, 539 N.Y.S.2d 659, 662 (N.Y.Surr.Ct.1989) (delivery complete upon physical transfer of share certificate); *In re Ruszkowski's Estate,* 256 N.Y.S.2d at 985–86 (same). In such cases, "[t]he question is simply, were all of the usual elements ... of a completed gift *inter vivos* present?" *In re Maijgren's Estate,* 193 Misc. 814, 84 N.Y.S.2d 664, 670 (N.Y.Surr.Ct.1948).

■ Nevertheless, in certain cases, recordation may be necessary to complete delivery. *Szabo* held that where the donor retains a part interest and does not physically deliver the certificate, the corporation must record the transfer in its stock records. This requirement does not derive from the corporation's insistence on its own formal requirements. Rather, it is necessary under the law of gifts to strip the donor of dominion and control over the interest represented by the shares. Thus, just as failure to satisfy corporate formalities does not prevent an *inter vivos* gift where the donor completes physical delivery of the shares, the corporation's waiver of its formalities does not transform an incomplete delivery into a completed one.[14]

The Lefraks also argue that the Corporation's acceptance of maintenance checks somehow waived any objection to the Lefraks' failure to comply with the Corporation's transfer formalities. Joseph always paid the maintenance. (Tr. 12.) Acceptance of maintenance checks from Joseph is consistent with the position that the transfer never occurred; absent a valid transfer, the proprietary lease required Joseph, the sole proprietary lessee, to pay the maintenance.

## CONCLUSION

Joseph failed to demonstrate clearly and unambiguously that he surrendered dominion and control over the interest he claims he transferred to Susan. As noted, until the bankruptcy, he could have transferred the shares and lease to a third party without Susan's knowledge or consent. Further, he could not transfer the lease without also transferring the shares, and the lease transfer must fall on this ground as well. Accordingly, the trustee is entitled to a declaration that the entire interest in the Apartment is property of the estate.

The foregoing constitutes the Court's findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a), made applicable by

---

**13.** The Lefraks occupied the Apartment together before the purported transfer, and continued to occupy the Apartment in the same manner afterwards. Joseph left the Apartment because the Lefraks separated. In addition, there is no evidence that Susan exercised a shareholder's right to vote her interests at an annual or special meeting of shareholders, or delivered a proxy to anyone to exercise those rights.

**14.** In any event, the Lefraks offered no proof that the Corporation intentionally waived its formal requirements of recordation. Indeed, at trial, it argued that the transfer had not been completed. (Tr. 9–10.)

Fed.Bankr.R. 7052. The trustee is directed to settle a judgment on notice.