**In re Joseph S. LEFRAK, Debtor.**

**Alexander SCHACHTER, as Trustee of the Estate of Joseph S. Lefrak, Plaintiff,**

**v.**

**Susan LEFRAK, Defendant.**

**Bankruptcy No. 96 B 43478 (SMB).**
**Adversary No. 98–8154A.**

United States Bankruptcy Court,
S.D. New York.

Aug. 14, 1998.

Rosenman & Colin LLP, New York City, A. Peter Lubitz, Melissa A. Hager, of counsel, for Plaintiff.

Law Offices of Ian J. Gazes, New York City, Ian J. Gazes, of counsel, for Defendant.

## MEMORANDUM DECISION DIRECTING DEFENDANT TO TURN OVER COOPERATIVE APARTMENT

STUART M. BERNSTEIN, Bankruptcy Judge.

Under section 365(d)(1) of the Bankruptcy Code, a chapter 7 trustee must assume or reject a debtor's unexpired lease within sixty days of the order for relief. If he fails to do so, and if the court does not grant him

additional time to decide, the lease will be deemed rejected. The primary issue before the Court is whether the debtor-shareholder's proprietary lease in a cooperative apartment building is a lease for purposes of section 365. The Court holds that it is not, and for the reasons set forth below, directs the occupant of the apartment, the debtor's non-debtor wife, the defendant Susan Lefrak ("Susan"), to turn over possession to the trustee. In addition, the trustee is entitled to payment of postpetition use and occupation in an amount to be determined in a subsequent hearing.

## BACKGROUND

### A. Prior Proceedings

This adversary proceeding represents the second round in a dispute between the trustee and the Lefraks. The first culminated in a decision that the estate owns the entire interest in the subject cooperative apartment (the "Apartment"), *see Schachter v. Lefrak (In re Lefrak),* 215 B.R. 930 (Bankr.S.D.N.Y. 1998), and the trustee subsequently commenced this suit to compel its turnover and to recover use and occupation from Susan. The relevant facts have been determined in the previous litigation or are not in dispute.

The debtor, Joseph S. Lefrak ("Joseph"), and Susan married in September 1952, and moved into the Apartment (14D), located at 983 Park Avenue in Manhattan, in 1976. In 1982, the building converted to cooperative ownership. Joseph acquired the shares (the "Shares") representing an interest in the corporation that owned the building (the "Corporation"), and entered into a proprietary lease (the "Lease") with the Corporation to occupy the Apartment. Joseph was the sole owner of the Shares and the sole lessee under the Lease.

The prior litigation concerned the ownership of the Shares and Lease.[1] The Lefraks contended that Joseph conveyed a 50% joint interest in the Shares and Lease to Susan in 1984. Thereafter, pursuant to a 1994 oral separation agreement, Joseph conveyed the

remaining 50%. Prior to but certainly no later than the oral separation agreement, Joseph moved out, and Susan became (and has remained) the sole occupant of the Apartment. The Lefraks argued that as a result of these transactions, Susan owned the Shares and Lease, and they never became property of Joseph's estate when he subsequently filed his chapter 7 petition in 1996.

The trustee challenged the transfers. He commenced the first adversary proceeding to avoid them and to obtain a judicial declaration that the estate owned 100% of the interest in the Apartment. Following a trial, the Court held that both transfers were ineffective. As a consequence, the entire interest in the Apartment became property of the estate. *In re Lefrak,* 215 B.R. at 938.[2]

### B. This Adversary Proceeding

The ruling did not address Susan's continued occupancy; she has lived in the Apartment, rent free, during the entire case. The parties agree that the unpaid postpetition maintenance is approximately $35,000.00, and continues to accrue at the monthly rate of about $2,500.00. The unpaid maintenance is secured by the interest in the Shares. (*By–Laws of 983 Tenants Corp.* ("By–Laws"), art. VI, § 6.) In addition, the Shares and Lease secure Joseph's loan from Dime Savings Bank, and this loan has not been satisfied. As a result, the failure to make monthly maintenance or mortgage payments eats away at the estate's equity.

Following the first decision, the trustee commenced this adversary proceeding to compel Susan to turn over the Apartment and to recover postpetition use and occupation charges of approximately $140,000.00. Susan did not answer, and the clerk entered her default. *See* Fed R. Civ. P. 55(a). Susan subsequently moved to vacate her default, and the trustee opposed the motion. He argued that she had failed to show a meritorious defense to the turnover application. It became evident that the dispute raised purely legal issues, and accordingly, the Court, with the parties' consent, vacated the default, accepted Susan's proposed answer and treat-

---

1. Joseph pledged both to Dime Savings Bank to secure the loan Dime made to enable Joseph to purchase the interest. Dime still retains possession of the Shares and Lease.

2. The Lefraks' appeal from the ensuing judgment is pending before the District Court.

ed the submissions as cross-motions for summary judgment.

In response to the trustee's turnover application, Susan makes two arguments.[3] First, Susan challenges the trustee's standing. The trustee failed to assume the Lease within sixty days following the judgment in the first adversary proceeding, and Susan argues that the Lease has been deemed rejected under 11 U.S.C. § 365(d)(1). The rejection, she maintains, results in an abandonment of the estate's interest in the Lease to Joseph, and the trustee has no right to evict her. Second, she contends that under the 1994 oral separation agreement, Joseph gave her a possessory interest in the Apartment which is superior to the estate's title. The parties have made other arguments as well, but in light of the Court's disposition, it is unnecessary to reach them.

## DISCUSSION

### A. The Scope of Section 365

To the extent relevant here, section 365 permits a chapter 7 trustee to assume or reject an unexpired lease. The purpose of this section is to benefit the estate by permitting assumption of beneficial leases and rejection of burdensome ones. *See Liona Corp. v. PCH Assocs. (In re PCH Assocs.)*, 804 F.2d 193, 200 (2d Cir.1986). The Code further provides that a lease is deemed rejected if the trustee does not move to assume it, or to extend his time to decide, within sixty days of entry of the order for relief. 11 U.S.C. § 365(d)(1).

 It is well-settled that section 365 applies only to "true" or "bona fide" leases, *see International Trade Admin. v. Rensselaer Polytechnic Inst.*, 936 F.2d 744, 748 (2d Cir.1991); *In re PCH Assocs.*, 804 F.2d at 198–99,[4] and its applicability presents a question of federal law. *Barney's, Inc. v. Isetan Co. (In re Barney's, Inc.)*, 206 B.R. 328, 332 (Bankr.S.D.N.Y.1997). Thus, while state law may treat the agreement as a lease,[5] this does not mandate the application of section 365. *In re Moreggia & Sons, Inc.*, 852 F.2d

---

3. In addition, Susan continues to press that the Court's original decision was wrong, and she owns the Shares and Lease. This issue is on appeal and will not be considered.

4. In *PCH*, the Second Circuit concluded that a broader reading of section 365 would create a large class of "lessors" who would benefit at the expense of the other creditors, with no concomitant benefit to the estate. *In re PCH Assocs.*, 804 F.2d at 200. Although not stated in so many words, the Court was doubtless concerned that assumption elevates a lessor's prepetition claim because the debtor must cure all defaults, including prepetition defaults, at the time of assumption or promptly thereafter. 11 U.S.C. § 365(b)(1)(A). Thus, while other unsecured creditors, at best, generally receive a percentage of their claims at the end of the case, the lessor under an assumed lease receives full payment and is not required to wait. Further, the assumption frees the lessor from the restrictions imposed on the amount of his claim under 11 U.S.C. § 502(b)(6) in the event that the debtor (or trustee) subsequently breaches the lease. *In re Klein Sleep Prods., Inc.*, 78 F.3d 18, 28–29 (2d Cir.1996).

While the *PCH* Court did not consider the effect of a lease rejection on the estate, rejection can similarly grant an unintended windfall at the creditors' expense. Susan's argument illustrates just how this can occur. Susan maintains that the trustee's "deemed" rejection of the Lease results in an abandonment, taking the Lease out of the estate and revesting title in Joseph. *See In re Rosenfeld*, 23 F.3d 833, 839 (4th Cir.), *cert. denied*, 513 U.S. 874, 115 S.Ct. 200, 130 L.Ed.2d 131 (1994); *Rich Mar Apartments v. Knight (In re Knight)*, 8 B.R. 925, 929 (Bankr.D.Md.1981). In addition, she argues that because the Shares and the Lease are inseparable, the estate must now abandon the Shares as well. Since Joseph has obtained a discharge, he would, therefore, receive title to the Shares and the Lease free of the claims of his unsecured creditors, and subject only to the liens of the Corporation (for unpaid maintenance) and the Dime (on account of the unpaid loan). Thus, the "deemed" rejection does not serve to free the estate from an onerous obligation to perform, but instead, strips it of a valuable interest in property, and grants a windfall to Joseph and, possibly, Susan.

5. New York treats tenant shareholders as lessees for some purposes and as real property owners for others. *Kessler v. Grand Cent. Dist. Management Ass'n, Inc.*, 960 F.Supp. 760, 767–68 & nn. 8–9 (S.D.N.Y.1997). The shares in the cooperative corporation and the proprietary lease cannot be viewed in isolation from one another. *Bland v. Two Trees Management Co.*, 66 N.Y.2d 556, 498 N.Y.S.2d 336, 489 N.E.2d 223, 227 (1985). Courts must assess, "on case-by-case basis which aspect of this paradoxical interest predominates, in order to determine the applicability of a particular rule of law or statutory scheme." *Estate of Carmer*, 71 N.Y.2d 781, 530 N.Y.S.2d 88, 525 N.E.2d 734, 735 (1988).

1179, 1182–83 (9th Cir.1988); *In re KAR Dev. Assocs., L.P.*, 180 B.R. 629, 638–39 (D.Kan.1995); *Hotel Syracuse, Inc. v. City of Syracuse Indus. Dev. Agency (In re Hotel Syracuse, Inc.)*, 155 B.R. 824, 838 (Bankr. N.D.N.Y.1993).

■ Instead, courts consider the economic substance of the transaction, *see International Trade Admin.*, 936 F.2d at 748; *In re PCH Assocs.*, 804 F.2d at 200, and whether "the parties intended to impose obligations and confer rights significantly different from those arising from the ordinary landlord/tenant relationship." *In re PCH Assocs.*, 804 F.2d at 200; *see In re Moreggia & Sons, Inc.*, 852 F.2d at 1184. Typically, the reported cases address the distinction between "true" leases and financing arrangements, and apply criteria that focus on that distinction. These include whether the "rent" reflects compensation for the use of the property or is structured as a return on an investment, whether the purchase price is based on the market value of the land or the amount necessary to finance the transaction, whether the property was purchased specifically for the lessee's use, whether the transaction is structured as a lease for tax reasons, whether the lessee assumes the obligations normally associated with outright ownership and whether the lessee can acquire the property at the end of the term for a nominal payment. *See, e.g., In re PCH Assocs.*, 804 F.2d at 200–01; *In re KAR Dev. Assocs., L.P.*, 180 B.R. at 639; *In re Barney's, Inc.*, 206 B.R. at 334; *In re Challa*, 186 B.R. 750, 757 (Bankr. M.D.Fla.1995); *In re Hotel Syracuse, Inc.*, 155 B.R. at 838–39; *see* S. Rep. No. 95–989, at 64 (1978). Other relevant considerations are the length of the lease, *International Trade Admin.*, 936 F.2d at 749–50, and whether the lease is part of a larger agreement. *In re TAK Broadcasting Corp.*, 137 B.R. 728, 731, 733–34 (W.D.Wis.1992).

## B. The Proprietary Lease and Section 365

■ The Lease in question is clearly not a financing device. The Corporation, the landlord under the Lease, did not lend Joseph any money, and there is no debt to secure. It does not follow, however, that because the

Lease fails the test of a disguised security agreement it must therefore be a "true" lease. Rather, the issue is whether the Lease created a typical residential landlord-tenant relationship, or instead, conferred the risks and rewards of home ownership. The inquiry remains the same—the economic substance or reality of the transaction—and many of the criteria used to distinguish leases from security arrangements are germane.

In the usual landlord-tenant relationship, a landlord acquires a building for his own benefit, and then rents apartments to his tenants at a profit, subject to the effects of the various rent control laws. The residential tenant does not fund the landlord's acquisition, and, aside from a security deposit, does not make an initial payment. The tenant receives a relatively short lease, and pays a fixed rent. He does not assume any of the obligations associated with ownership; he has no liability for operating costs beyond the payment of rent. Similarly, he does not face the risks or enjoy the rewards of fluctuating values in the real property market. While the tenant has the right to use and enjoy the premises during the term of his lease, he does not acquire an asset that he can pledge or sell, and at the end of his lease (and absent a lease renewal), he simply leaves.

The Lease reflects many aspects of an ordinary residential tenancy, and as noted, New York law often treats the proprietary lessee in the same manner as a residential tenant. Nevertheless, the economic reality of the entire transaction between the Corporation and Joseph demonstrates that Joseph purchased real property, and his interest cannot be distinguished from that of another debtor who buys a home. An interest in a cooperative apartment is *sui generis. Estate of Carmer*, 71 N.Y.2d 781, 530 N.Y.S.2d 88, 525 N.E.2d 734, 735 (1988). A corporation owns the land and building, a prospective resident purchases shares in the corporation, and the share ownership entitles the shareholder to a long term proprietary lease for a specific apartment. *State Tax Comm'n v. Shor*, 43 N.Y.2d 151, 400 N.Y.S.2d 805, 371 N.E.2d 523, 526 (1977).

The Corporation, though titular landlord under the Lease, acts as a representative of the tenant shareholders, and acquires and operates the building for the tenant shareholders' benefit rather than its own. The by-laws of the Corporation state that "[t]he primary purpose of the Corporation is to provide residences for the shareholders who shall be entitled, solely by reason of their ownership of the shares, to proprietary leases for apartments in the building owned by the Corporation." (*By–Laws*, art. I, § 1.)[6] No one shareholder could acquire the entire building, and become a real estate owner in the usual sense. Instead, the Corporation acted as a conduit, facilitating the acquisition so that Joseph and the other shareholders could then purchase the interests in their individual apartments.

In order to acquire his cooperative interest, Joseph had to make a substantial payment, similar to buying a house, which the Corporation used to fund the acquisition of the building. The Corporation raised the cash portion of the purchase price—approximately $7.5 million (*see Offering Plan* at 14)—from the shareholders. It offered 75,-053 shares of stock for sale at $100.00 per share, (*see id.* at 4c), but its offering did not include a profit factor. (*See id.* at 25.) The shares were allocated to the fifty-five apartments in the building based upon each apartment's perceived value relative to the perceived value of all other apartments in the building. (*See id.* at 3.)[7] The Corporation allocated 919 shares, and a purchase price of $91,900.00 to the Apartment, (*id.* at 4c), which Joseph had to pay to become a shareholder.

Once Joseph became a shareholder, he acquired the right to enter into a 98 year proprietary lease. (*Proprietary Lease* at 1). His maintenance obligation under the Lease reflected his *pro rata* share of the Corporation's projected cash requirements, *i.e.*, oper-

ating expenses, mortgage and taxes, (*Proprietary Lease* at 1, 2; *Offering Plan* at 4–4e), budgeted annually by the Corporation's board of directors without regard to profit. (*See Proprietary Lease* at 2.) In this manner, the usual landlord expenses of operating the building were passed through the Corporation directly to the tenant shareholders who bore the ultimate obligation to pay them. If operating expenses increased, or the Corporation suddenly needed cash that it did not have, Joseph had pay his share through maintenance increases or assessments. Even if expenses did not change, the shareholders were ultimately responsible to cover a short fall created when another shareholder failed to pay maintenance or an assessment.

Like other real property owners, Joseph also enjoyed the risks and rewards of a fluctuating real estate market. His interest represented a substantial asset which he could sell, or as he did, pledge to secure a loan. If real estate values rose, he benefitted through the ability to sell his interest at a higher price, or secure a greater amount of indebtedness; if they fell, he suffered a corresponding detriment.

In addition, and as already mentioned, the execution of the Lease was part of a larger transaction with non-lease attributes. To be eligible to enter into the Lease, Joseph had to purchase the Shares. The Shares and Lease are inseparable, *State Tax Comm'n v. Shor*, 400 N.Y.S.2d 805, 371 N.E.2d at 524, and cannot be viewed in isolation. *Bland v. Two Trees Management Co.*, 498 N.Y.S.2d 336, 489 N.E.2d at 227. Yet, while Susan contends that the Lease must be assumed or rejected, she never argues that the Shares are subject to section 365. Interestingly, Susan nonetheless reaches this very result through the back door. She maintains that once the Lease was rejected, the inseparabil-

---

6. The by-laws are part of the *Offering Plan [re Conversion to Cooperative Ownership of Premises at 983 Park Avenue, New York, New York 10028]*, dated Apr. 2, 1982 ("*Offering Plan* "). The *Offering Plan* was received in evidence at the first trial as Plaintiff's exhibit "B."

7. For example, the "D" line, which included the Apartment, consisted, with one exception, of a

six room apartment with three bathrooms. Moving from lowest to highest floors, the share allocation ranged from 869 (second floor) to 923 (fifteenth floor), and the purchase price from $86,900.00 to $92,300.00. These values vary based on the floor location of the apartment without regard to its condition.

ity of the Shares rendered them valueless to the trustee, and he should be compelled to abandon the Shares. Susan implicitly assumes that the Lease can drag the Shares within the scope section 365, and ignores the opposite possibility.

As a shareholder, Joseph had rights that a residential tenant does not. For example, his share ownership entitled him to vote for a board of directors. The directors run the Corporation for the tenant shareholders' benefit, and owe them fiduciary duties. *See, e.g., Levandusky v. One Fifth Avenue Apartment Corp.,* 75 N.Y.2d 530, 554 N.Y.S.2d 807, 553 N.E.2d 1317, 1321–22 (1990); *Smolinsky v. 46 Rampasture Owners, Inc.,* 230 A.D.2d 620, 646 N.Y.S.2d 110, 112 (1996); *Katz v. 215 West 91st Street Corp.,* 215 A.D.2d 265, 626 N.Y.S.2d 796, 797–98 (N.Y.App.Div.1995). The Corporation must keep "full and correct books," which any proprietary lessee may inspect, and must also deliver certified annual financial statements. (*Proprietary Lease* at 5); *see* N.Y. Bus. Corp. Law § 624 (McKinney 1986).

Thus, the relationship between the cooperative housing corporation and the proprietary lessee is atypical, and the limited authorities support the conclusion that the Shares and Lease should not be treated as a "true" lease under section 365. In *In re Rosenfeld,* 23 F.3d 833 (4th Cir.), *cert. denied,* 513 U.S. 874, 115 S.Ct. 200, 130 L.Ed.2d 131 (1994), a discharged chapter 7 debtor argued that his trustee's failure to assume his proprietary lease resulted in its "deemed" rejection, and terminated his obligation to pay cooperative dues. *Id.* at 838. The Court disagreed, noting that under the Virginia statutes— which are similar to the laws of New York— the proprietary lease was not a lease in the traditional sense, and hence, not subject to rejection:

> More importantly, Rosenfeld's argument is not supported by the statute. The cooperative interest is defined as "an ownership interest in the [cooperative] association coupled with a possessory interest in a unit under a proprietary lease." [Citation omitted.] Any transfer of an ownership interest in an association without the possessory interest in the unit to which the ownership interest is related is void. [Citation omitted.] Thus, the possessory interest granted by the proprietary lease is inseparable from the ownership interest in the cooperative. The proprietary lease is not a lease in the traditional sense, but a method of indicating in which of the commonly-owned apartments a particular owner has a possessory interest. Rosenfeld retains title to his cooperative interest and the possessory interest in his apartment as well.

*Id.* at 838–39.

*In re Robertson,* 147 B.R. 358 (Bankr. D.N.J.1992) dealt with a different but analogous issue, and its reasoning supports the same conclusion. There, the court was called upon to decide whether a proprietary lessee could be dispossessed through the state court procedures available to ordinary residential landlords under New Jersey law. The bankruptcy court contrasted the proprietary lessee with the usual residential tenant, and ultimately concluded that the differences were sufficient to deprive the cooperative housing corporation of recourse to the typical landlord's remedies:

> Likewise, the role of the cooperator/shareholder is not the same as that of the typical tenant. Nor does the function of the cooperative achieve the same results of the landlord/tenant relationship. As stated previously, the cooperator/shareholder is entitled to occupancy permanently for the life of the cooperative corporation. The tenant does not have such security, in fact, his occupancy is limited to the term of the lease, or if there is no written lease, to a month to month tenancy. The cooperator is a stockholder-occupant who pays one lump sum (as the Debtor did in this case) at the beginning of the cooperative/cooperator relationship for the ownership of the unit and then continues to pay monthly maintenance costs for the expenses incurred in operation of the cooperative corporation. The tenant merely rents a space and pays an equal sum in installments for the duration of his or her tenancy. The cooperators/shareholders are responsible for the expenses related to maintaining the prem-

ises amongst themselves. If one cooperator/shareholder fails to make a monthly payment, the other cooperators/shareholders are responsible for that payment. By contrast, the tenant is solely responsible for his monthly payments and depends upon the landlord to properly maintain the premises. If that tenant fails to pay his rent, he subjects himself to removal from the premises. Finally, a cooperative generally is not a money making venture. On the other hand, a landlord rents to tenants for the landlord's own economic benefit.

*Id.* at 365.

Finally, the Internal Revenue Code allows the cooperative tenant-shareholder, rather than the corporation, to take an income tax deduction for real estate taxes and mortgage interest paid by the corporation. *See* 26 U.S.C. § 216. The purpose of section 216 is to put cooperative tenant-shareholders on an equal footing with home owners, who can deduct mortgage interest and property taxes under 26 U.S.C. §§ 163 and 164, respectively. *Eckstein v. United States,* 196 Ct.Cl. 644, 452 F.2d 1036, 1047–48 and nn. 19–20 (1971). In contrast, residential rental expenses are in the nature of personal, family or living expenses and are not deductible. *Id.,* 452 F.2d at 1048 n. 20; *see* 26 U.S.C. § 262.

Susan's authorities do not support a contrary conclusion. In *Bentley v. 75 East End Owners, Inc. (In re Bentley),* 26 B.R. 69 (Bankr.S.D.N.Y.1982), the court held that an anti-assignment clause in a proprietary lease was unconscionable. The only hint of the section 365 issue appears in background facts; the court noted that "[o]n June 29, 1981, Bentley was authorized to assume, *without opposition,* the unexpired proprietary lease for the Apartment as an executory contract." *Id.* at 70 (emphasis added); *compare In re Lippman,* 122 B.R. 206, 207 and n. 1 (Bankr.S.D.N.Y.1990) (reaching merits of cooperative corporation's motion to deem debtor's proprietary leases rejected, but specifically noting that the debtor did not object to movant's characterization of his interests as true leaseholds). Thus, the court did not decide that a proprietary lease fell within the reach of section 365.

In *In re Miller,* 125. B.R. 441 (Bankr. W.D.Pa.1991), the bankruptcy court allowed the debtors, who owned a condominium, to reopen their no-asset chapter 7 case to schedule and reject an executory maintenance contract with the condominium association. At the time of filing, the debtors were current on their maintenance obligations and intended to abandon the condominium to the undersecured mortgagee. *Id.* at 442. The parties' arguments and the court's analysis focused on the dischargeability of postpetition assessments for condominium maintenance. The court *assumed* that the maintenance contract was an executory contract capable of being rejected by a debtor. Accordingly, the case offers little guidance as to whether a proprietary lease falls within section 365.

In summary, the Lease is not a "true" lease under section 365. Accordingly, the trustee's failure to assume the Lease did not lead to its rejection or affect the estate's interest. The economic substance of the transaction, particularly the allocation of rights, obligations, risks and rewards between Joseph and the Corporation, indicate an intent to pass the incidents of ownership interest through the Corporation to the tenant shareholders. Had the parties called their occupancy agreement a "cooperative apartment deed" rather than a proprietary lease, they would have more accurately expressed the nature of the interest that Joseph acquired.

## C. Susan's Possessory Interest

Susan contends that even if the estate owns the Apartment, she nevertheless holds a possessory interest, and apparently, can remain indefinitely without paying maintenance or use and occupation. First, she argues that the Apartment is a "marital asset," and implies that this gives her a right of possession. "Marital property" is a concept unique to equitable distribution. It consists of "all property acquired by either or both spouses during the marriage and before the execution of a separation agreement or the commencement of a matrimonial action, regardless of the form in which title is held." N.Y. Dom. Rel. Law § 236, Part B, subd. 1(c)

(McKinney 1986). Joseph's interest in the Apartment qualifies as "marital property."

■■■ Under New York law, a spouse's right in "marital property" owned by the other, debtor spouse, does not affect the rights of the debtor spouse's creditors. *Aluminum Co. of Am. v. Moskovitz*, No. 88 Civ. 2616, 1991 WL 177246, at *3 (S.D.N.Y. Sept. 5, 1991). The rights in "marital property" are inchoate and do not vest until entry of a judgment dissolving the marriage. *In re Cole*, 202 B.R. 356, 360 (Bankr.S.D.N.Y.1996)(citing cases). If the state court enters a divorce decree, makes an equitable distribution award and transfers title to the nondebtor spouse prior to bankruptcy, the property will not become property of the debtor spouse's estate. *See In re Purpura*, 170 B.R. 202, 208 (Bankr.E.D.N.Y. 1994); *In re Greenwald*, 134 B.R. 729, 730–31 (Bankr.S.D.N.Y.1991). However, if bankruptcy intervenes prior to the divorce decree, the bankruptcy cuts off the inchoate right in "marital property," and leaves the nondebtor spouse with an unsecured claim. *See In re Cole*, 202 B.R. at 360. The Lefrak's marriage has never been dissolved, and no court has rendered an equitable distribution award or granted Susan any rights in the Apartment. Accordingly, although the Apartment may meet the definition of "marital property," Joseph's intervening bankruptcy cuts off her rights, and renders his interest in the Apartment subject to the claims of his creditors through his bankruptcy.

Second, Susan contends that she acquired a possessory interest in the Apartment under the oral separation agreement. According to Susan, the 1994 agreement contained the following material terms:

1. The Lefraks would live separate and apart.

2. Joseph would relinquish his interest in the Apartment, and Susan would be the sole owner, free of any right or claim by Joseph.

3. All personal property, furniture and fixtures in the Apartment would be Susan's sole property.

4. Joseph would support Susan in a manner comparable to her pre-separation standard of living, and pay the maintenance, mortgage, taxes and insurance on the Apartment.

(*Affidavit of Susan Lefrak*, sworn to May 19, 1998, ¶ 2.)

Her argument is merely a rehash of one she and Joseph have already lost. In the prior adversary proceeding, the Court ruled that the 1994 attempted transfer was ineffective. *See In re Lefrak*, 215 B.R. at 932. Her present argument bifurcates possession and title, suggesting that if the transfer of the latter fell, somehow, the transfer of the former did not. There are two fallacies with this argument: one factual and one legal. The 1994 agreement does not state or imply that Joseph will remain the owner and provide rent-free occupancy to Susan. Rather, the agreement provides that Joseph will transfer his remaining ownership interest, and live elsewhere. Further, Susan does not articulate why, as a matter of law, the transaction she describes created a possessory right apart from the transfer of title that has been ruled invalid.

■■■ In the absence of a possessory interest granted by valid agreement or decree, Susan occupies the Apartment solely by virtue of her right to support inherent in the marital relationship. *See Rosenstiel v. Rosenstiel*, 20 A.D.2d 71, 245 N.Y.S.2d 395, 401 (1963). However, Joseph's obligation to provide suitable housing does not, without more, give Susan a right in specific property, *i.e.*, the Apartment. *See id.*, 245 N.Y.S.2d at 402–03 (Steuer, J. concurring). Further, the trustee stands in the shoes of a judicial lien creditor. 11 U.S.C. § 544(a). If a judgment creditor executed on Joseph's interest outside of bankruptcy, Susan could not remain in the Apartment absent the consent of the judgment creditor. *See Algemene Bank Nederland N.V. v. Toepfer*, 175 A.D.2d 4, 573 N.Y.S.2d 72, 74–75 (1991). The trustee's turnover proceeding serves the same function, and Susan, who does not allege an occupancy agreement with the trustee, must vacate the Apartment.

**D. The Trustee's Right to Use and Occupation**

■■■ Having determined that Susan has no right to occupy the Apartment, the Court

must turn to whether she must pay use and occupation to the estate. Susan essentially argues that she may live rent free. Each month, the unpaid maintenance becomes a lien on the Shares. If the estate ultimately prevails on the title question and owns the entire interest in the Shares and Lease, the creditors will be substantially prejudiced by Susan's failure to pay maintenance and the resulting increase in the Corporation's lien. Her refusal to vacate or pay maintenance grants her a windfall—a rent free, six room apartment on Park Avenue near 81st Street—at the creditors' expense. This would appear to fit the dictionary definition of unjust enrichment. *See In re Chateaugay Corp.,* 10 F.3d 944, 957–58 (2d Cir.1993).

The two cases cited by Susan do not support her claimed right to live rent free. *Campo v. Sontag (In re Sontag),* 151 B.R. 664, 669 (Bankr.E.D.N.Y.1993) and *Oliva v. Oliva,* 136 A.D.2d 611, 523 N.Y.S.2d 859, 860 (1988) both state the common law rule that one cotenant has no obligation to pay rent to another cotenant. As this Court has already determined, Joseph was the sole owner of the Shares and the Lease, and he and Susan were not tenants in common. Further, in each case, the spouse occupied the residence pursuant to a matrimonial court order. *See In re Sontag,* 151 B.R. at 669; *Oliva v. Oliva,* 523 N.Y.S.2d at 860. In contrast, no court has awarded Susan exclusive possession—or any possession—of the Apartment. The Lefraks had well over a year to convert their oral agreement into a court-approved arrangement before Joseph filed this case. Further, the relevant equities to consider are not those between Joseph and Susan, but those between Susan and the creditors of Joseph's estate. The Court has not been presented with any factors which tilt the balance of these equities in Susan's favor, and accordingly, she is liable to the estate for use and occupation.

## CONCLUSION

The trustee is entitled to an order directing Susan to surrender the Apartment. The trustee is also entitled to use and occupation in an amount to be fixed at a subsequent hearing. The parties are directed to contact chambers to obtain a hearing date.

Settle order on notice.